**BROTHERHOOD OF LOCOMOTIVE EN-
GINEERS et al., Plaintiffs-
Appellants,**

v.

**The BALTIMORE & OHIO RAILROAD
COMPANY, a corporation, et al.,
Defendants-Appellees.**

No. 13876.

United States Court of Appeals
Seventh Circuit.

Nov. 28, 1962.

Rehearing Denied Dec. 19, 1962.

Milton Kramer, Washington, D. C., Burke Williamson, Chicago, Ill., Lester P. Schoene, Schoene & Kramer, Washington, D. C., for all plaintiffs-appellants.

Harold N. McLaughlin, Cleveland, Ohio, for plaintiff-appellant Brotherhood of Locomotive Engineers.

Harold C. Heiss, Cleveland, Ohio, for plaintiff-appellant Brotherhood of Locomotive Firemen & Enginemen.

Harry Wilmarth, Cedar Rapids, Iowa, for plaintiff-appellant Order of Railway Conductors and Brakemen.

Edward B. Henslee, Jr., Chicago, Ill., for plaintiff-appellant Brotherhood of Railroad Trainmen.

Howard Neitzert, Martin M. Lucente, Chicago, Ill., Hermon M. Wells, Philadelphia, Pa., James R. Wolfe, Chicago, Ill. (Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel), for defendants-appellees.

Before SCHNACKENBERG, CASTLE and SWYGERT, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

A complaint was filed in the District Court by plaintiffs, Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, Order of Railway Conductors and Brakemen, Brotherhood of Railroad Trainmen, and Switchmen's Union of North America, unincorporated labor organizations. It designated as defendants, The Baltimore & Ohio Railroad Company and fifteen other named railroad companies, described as representatives of a class of railroads that is so numerous (more than 200) as to make it impracticable to bring them all before the court.

The complaint sought a judgment declaring unlawful a July 17, 1962 Promulgation of Revision in Work Rules issued by defendants, with respect to defendants' operating employees represented by plaintiffs in collective bargaining duly authorized under the Railway Labor Act, 45 U.S.C.A. § 151 et seq. Each of the members of the class represented by defendants is a carrier as defined in § 1 of the Act.[1]

On August 6, 1962 at the conclusion of arguments on a motion of the Carriers to dismiss the complaint, they were permitted by the court and without objection from the Organizations, to withdraw their July 17, 1962 promulgation of rules changes. The Carriers then by letter issued a promulgation of rules changes dated August 6, 1962, which stated that the changes proposed by the Carriers in their notice served under § 6 of the Railway Labor Act (45 U.S.C.A. § 156) on November 2, 1959 would become effective August 16, 1962. The Organizations thereupon amended their complaint to seek similar relief against the later promulgation.

On August 8, 1962, the court, after hearing arguments upon the Carriers' motion to dismiss, entered an order dismissing the amended complaint for failure to state a claim upon which relief could be granted and also denying a mo-

---

1. Plaintiffs are sometimes hereinafter referred to as the Organizations and defendants will at times be referred to as the Carriers.

tion for a preliminary injunction based thereon. The Organizations appealed from that order and moved for an injunction pending appeal, under 28 U.S.C.A. Rule 62(c). This injunction was granted on August 10, 1962. In our case No. 13855 we heard arguments on a motion of the Carriers to dissolve and vacate that injunction and on August 15, 1962 we denied the motion. We have this day disposed of that case.

In case No. 13876 there was evidence tending to prove the facts which we now summarize.[2]

By letter dated February 10, 1959, President Loomis of the Association of American Railroads invited the Organizations to join with the Carriers in seeking the creation of a presidential commission to investigate and make a report on rules about which the Carriers complained, and, more particularly, the impact of the existing rules on the public welfare.

This proposal was rejected by the Organizations on June 4, 1959 in a letter to President Loomis. At the same time they addressed a letter to the Secretary of Labor of the United States, in which it was stated:

"In the event that an effort is made by Mr. Loomis or the railroad representatives to induce President Eisenhower to appoint a board or commission to investigate what they term 'featherbedding of railroad employees', we hope that you will see fit to suggest to the President that such a board or commission should not be appointed; but that if any investigation is to be made, it should be made along the lines of the Report of Emergency Board No. 109 and take into consideration all phases of the industry, including managerial and financial practices, instead of singling out the operating employees exclusively." [3]

Testimony at the trial supports the factual allegations in a letter by Mr. Loomis to the President of the United States, under date of August 17, 1959, from which we quote:

"1. For more than 20 years, efforts have been made to negotiate changes in the light of the great technological improvements in the industry, but such efforts have produced no substantial or meaningful relief.

"2. Continued existence of these rules imperils employment in the industry. In the last decade, an average of 1,000 jobs a week has been lost, and an even greater loss is inevitable if the rules are not modernized in keeping with mid-Century operating practice and competitive reality.

"3. Need for a broad study of the wage and rules structure by a special Presidential Commission has been noted by numerous Presidential Emergency Boards, including Board

---

2. The Organizations in a reply brief submit that, on this appeal, we should not consider certain factual matters appearing from evidence in the record, because they are *irrelevant* on this appeal. They do concede, however, that they do not question that we may consider such material if we choose. The criticism is directed at facts proved by the Carriers before the district court in connection with the Organizations' motion for injunction pending appeal hereinbefore referred to, *supra*.

We do not deem it our duty to close our eyes to relevant facts actually appearing before us in the record. The mere occasion for their proof does not render them irrelevant. We hold that this evidence was relevant, not only on the question of the issuance of an injunction pending appeal, but also on the merits of the case stated in the complaint as amended. Both phases of the case involved the same general subject matter and the identical parties. Cf. United States v. Nudelman, 7 Cir., 104 F.2d 549, 552; and also Wilson v. Calculagraph Co., 1 Cir., 153 F. 961, 962.

This view is in harmony with the liberal provisions of Rule 12(b) (6) and (c) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Rule 12.

3. The term "featherbedding" did not appear in Mr. Loomis' letter.

No. 109, which you appointed in 1955. This Board stated clearly: 'There is imperative need in this industry and specifically in the operating classifications for a thoroughgoing review and modernization of the internal wage structures. Indeed, such a review and rationalization is long overdue.' That Board was immediately concerned with the question of wage differentials between classes of employees but its recommendation constitutes a clear recognition that a broad study of the operating wage and rules structure such as is now sought calls for the appointment of a special Presidential Commission.

\* \* \* \* \* \*

"5. The Interstate Commerce Commission, in its landmark report of May 18, 1959, on the railroad passenger deficit problem, called for a public review and revision of working rules for railroad employees.

"6. A study now, in an atmosphere of calmness, can achieve far more effective results than fact-finding by the Presidential Emergency Board provided for by law if the issue threatens a transportation tie-up. As the current three-year moratorium on work-rule changes expires on October 31, 1959, it seems to us most urgent that action be taken in advance of possible crisis and while there is still time for rational decisions in the national interest.

"7. Finally, and perhaps most important, drawing up sound new work standards for the railroad industry has become so complex and challenging that the machinery provided for settling ordinary disputes appears hopelessly inadequate to cope with this task. Only a new, broader-based and determined approach has real hope of coming up with workable and fair solutions.

"For all these primary reasons, Mr. President, railroad management appeals to you to appoint a commission clothed with the objectivity and prestige of your office to examine this problem from the standpoint of the public's interest, and to recommend steps to bring these rules into line with modern conditions to the benefit of all parties concerned."

On August 24, 1959, the Organizations wrote to the President opposing his appointment of a Commission and urging a policy of non-government intervention.

The President, by letter dated September 9, 1959, refused to appoint a commission.

On November 2, 1959, the Carriers served on the representatives of the Organizations, pursuant to the provisions of Section 6 of the Railway Labor Act, notices of intended changes in agreements affecting rates of pay, rules and working conditions, which proposed changes are now before this court. These proposed changes in existing agreements contemplate the following:

1. The elimination of existing rules and agreements requiring the use of firemen on other than steam locomotives when used in yard and freight service.

2. The revision of rules governing the basis of pay and the assignments of railroad operating employees used in through freight and straightaway passenger service.

3. The elimination of rules requiring the use of a stipulated number of trainmen in road train crews and a stipulated number of brakemen (helpers) in yard ground crews.

4. The elimination of rules requiring the use of operating employees on motor cars and self-propelled work machines used in inspection, construction, repair and maintenance work, and

5. Various miscellaneous and minor other changes which are not material in these proceedings.

The evidence in the record is to the effect that certain rules contained in ex-

isting agreements between the Carriers and their operating employees, during the year 1961, cost the railroad industry $592,062,000 in wage costs for unneeded employees occupying redundant positions, pay for time not worked, compensation that was not commensurate with the value of the services rendered, and the cost of owning and maintaining equipment and facilities that would not be required apart from the restrictions placed upon the efficiency and economy of operations by such rules.

Following service of the Carriers' notices, the proposals therein contained were the subject of conferences on individual railroads, but no agreements were reached. On June 9, 1960, the Carriers requested concerted national handling of their proposals by national bargaining committees designated by the Carriers and the Organizations. Meetings of such national bargaining committees were begun on July 6, 1960, and extended through October 17, 1960. During such national conferences the Organizations contended that the ordinary processes of the Railway Labor Act were not suited to handling the Carriers' proposals, and now urged that the parties agree to refer the Carriers' proposals and such other proposals as either party might desire to submit to "a special wage study commission." This merely produced further correspondence.

On October 17, 1960, an agreement was entered into between the Carriers and the Organizations, under the auspices of the Secretary of Labor, providing for the creation of a Presidential Railroad Commission to investigate the facts and report its findings and recommendations to the President with respect to the controversy between the parties— substantially as proposed by the Organizations. It was further provided in said agreement that the "controversy between the parties" involved the proposals of the Carriers contained in their Section 6 notices of November 2, 1959, and proposals of the Organizations served on the Carriers on September 7, 1960 (both of which were attached to the memorandum) "including any implementing proposal or proposals that may be submitted to the Commission." The memorandum also contained, among others, the following provisions:

"2.  * * * The Commission may recommend that any proposal or implementing proposal or any part of any such proposal should be rejected in whole or in part or accepted in whole or in part, or should be accepted as amended or revised by the Commission, as it finds under the evidence to be justified.

\*     \*     \*     \*     \*     \*

"4.  * * * The Commission shall also be authorized to use its best efforts, by mediation, to bring about an amicable settlement and agreement between the parties with respect to any issue concerning which the evidence has been heard.

"5.  It is the intent of the parties that the proceedings of the Commission, including its mediatory efforts and its report *shall be considered and accepted as in lieu of the mediation and emergency board procedures provided by Sections 5 and 10 of the Railway Labor Act.* (Italics supplied.)

"National conferences between the parties under the Railway Labor Act shall be resumed and expedited, provided no settlement is sooner reached, immediately following the report of the Commission.

"In the event the National Mediation Board shall proffer its services, or the Board's services be invoked, the parties will jointly request the Board to expedite mediation and as promptly as feasible terminate the Board's services under the Act."

The Organizations thereafter expressed their entire satisfaction with the ar-

rangements stipulated in the agreement, and reasserted their contention "that the work rules problem is 'too difficult' to be resolved under the regular procedures of the Railway Labor Act"; and on November 1, 1960, the Presidential Commission requested by the parties was duly created by Executive Order No. 10891, U.S.Code Cong. and Adm.News 1960, p. 1693.

The members of the Commission were appointed by the President on December 22, 1960. Five of the members of the Commission were appointed from nominations submitted by the Organizations, five members from nominations submitted by the Carriers, and five public members were appointed without nominations from the parties.

The Commission began its hearings on February 16, 1961, and delivered its report and recommendations to the President on February 28, 1962. There were 15,500 pages of oral testimony and thousands of pages of exhibits received by the Commission. The Commission also made numerous studies independently of the parties, and was assisted in its work by a staff of independent technical experts. Beginning in October, following the fact-gathering stage of the Commission's proceedings, the public members of the Commission sought to narrow the issues and mediate the differences between the parties, but no agreement was reached.

When the report and recommendations of the Commission were delivered to the President on February 28, 1962, he requested the parties to enter into immediate and expeditious collective bargaining over the issues which remained in dispute. National conferences were resumed on April 2, 1962, and continued through May 17, 1962. The Carriers accepted the report and recommendations of the Presidential Commission but its report and recommendations were rejected by the Organizations, and no agreement was reached.

On May 21, 1962, the Organizations made application for the mediation services of the National Mediation Board under Section 5 of the Railway Labor Act, and during the period May 25 to June 22, 1962, approximately 32 meetings were held with the representatives of the Carriers and the Organizations under the auspices of the chairman of that Board. But the National Mediation Board was unable to bring the parties into agreement.

On June 26, 1962, the National Mediation Board requested and urged that the Carriers and the Organizations enter into an agreement to submit the controversy to arbitration under Section 7 of the Railway Labor Act (45 U.S.C.A. § 157). The Carriers accepted this proffer of arbitration but the Organizations rejected it.

On July 16, 1962, the National Mediation Board advised the parties that in its judgment all practical methods provided for its adjusting the dispute had been exhausted without effecting a settlement, and that the Board had that day terminated its services under the provisions of the Railway Labor Act.

On the next day, the Carriers issued the promulgation of July 17, 1962, p. 504, for which the promulgation of August 6, 1962 was substituted, p. 504.

1. As amended, the complaint of the Organizations alleges that the Carriers' promulgation of rules of August 6, 1962 violates the Railway Labor Act.

They argue that it is unlawful because, if given effect, it would destroy the basic ingredient upon which the Railway Labor Act and the other federal labor laws depend for success in the elimination of strikes. They define this essential ingredient as knowledge on the part of the employees and their supervisors of the rates of pay and the terms and conditions of employment, the source of which knowledge is the collective bargaining agreement.

In short, they argue that mutual knowledge granted by collective agreement, tends to promote understanding between the employees and the employer and hence reduces the occasions for sur-

prise, for friction, for discontent, for strikes, and for interruptions to the flow of interstate commerce. They cite Local 24 of Intern. Broth. of Teamsters, etc. v. Oliver, 358 U.S. 283, 295, 79 S.Ct. 297, 3 L.Ed.2d 312, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33, 57 S.Ct. 615, 81 L.Ed. 893, and National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 266, 58 S.Ct. 571, 82 L.Ed. 831. They point out that collective bargaining in the railroad industry long antedated the enactment of the Act, especially in the operating crafts, and that it was enacted to prevent unilateral determinations by the carriers. They assert that the promulgation which they now attack would confer on the Carriers just such power of unilateral determination.

In referring to the legislative history of the Act, counsel for the Organizations cite Representative Casey on the floor of the House, when he said, concerning the 1924 bill (65 Cong.Rec. 8923):

"This bill does not prevent any change in present rates of pay or working conditions, unless the parties agree to a change.

"It does prevent an arbitrary change of wages or rules without notice or opportunity for conference, after which, if an agreement can not be reached, the parties are free to act independently."

The Organizations' cause of action is set forth in the amended complaint as follows:

"Said second Promulgation is in violation of Section 2, First of the Railway Labor Act in that it announces that effective August 16, 1962 there will be no rules concerning the assignment of employees * * * the minimum number of such assignments to a train or engine, and the classification of such assignments, * * * notwithstanding that for many years it has been the custom, practice, and usage for the collective bargaining agreements * * * to contain such rules * * *."

They rely particularly upon § 2, First and Seventh (45 U.S.C.A. § 152, First and Seventh), and § 6 of the Railway Labor Act as indicating that congress intended to achieve stability in conditions and rules under which railway employees perform their services. Section 2, First, provides:

"It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

Section 2, Seventh, provides:

"No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."

Section 6 of the Act reads:

"Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its serv-

ices, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board. * * * "

The Supreme Court described the nature of the procedures provided by the Railway Labor Act which we deem relevant here, in Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U.S. 711, at 724, 65 S.Ct. 1282, at 1290, 87 L.Ed. 1886 (1945), where the court said, that, to induce agreement for the settlement of disputes, the first of three stages required its negotiation, which seeks voluntary action by both sides, in the sense that agreement is sought and cannot be compelled. At 725, 65 S.Ct. at 1290, the court added:

"Beyond the initial stages of negotiation and conference, however, the procedures diverge. 'Major disputes' go first to mediation under the auspices of the National Mediation Board; if that fails, then to acceptance or rejection of arbitration, cf. § 7; [Brotherhood of R. R.] Trainmen v. Toledo, P. & W. R. Co., 321 U.S. 50 [64 S.Ct. 413, 88 L.Ed. 534]; and finally to possible presidential intervention to secure adjustment. § 10. For their settlement the statutory scheme retains throughout the traditional voluntary processes of negotiation, mediation, voluntary arbitration, and conciliation. Every facility for bringing about agreement is provided and pressures for mobilizing public opinion are applied. The parties are required to submit to the successive procedures designed to induce agreement. § 5 First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration."

In Terminal Assn. of St. Louis v. Trainmen, 318 U.S. 1, 6, 63 S.Ct. 420, 423, 87 L.Ed. 571, the court made these observations which are pertinent here:

"The Railway Labor Act, like the National Labor Relations Act [29 U.S.C. § 151 et seq.], does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be reached with respect to them. The national interest expressed by those Acts is not primarily in the working conditions as such. So far as the Act itself is concerned these conditions may be as bad as the employees will tolerate or be made as good as they can bargain for. The Act does not fix and does not authorize anyone to fix generally applicable standards for working conditions. *The federal interest that is fostered is to see that disagreement about conditions does not reach the point of interfering with interstate commerce.* * * * " (Italics supplied.)

That language suggests this quotation from National Labor Relations Board v. American Ins. Co., 343 U.S. 395, 402, 72 S.Ct. 824, 828, 96 L.Ed. 1027:

" * * * The theory of the Act [National Labor Relations] is that the making of voluntary labor agreements is encouraged by protecting employees' rights to organize for collective bargaining and by imposing on labor and management the mutual obligation to bargain collectively.

"Enforcement of the obligation to bargain collectively is crucial to the statutory scheme. And, as has long been recognized, performance of the duty to bargain requires more than a willingness to enter upon a sterile discussion of union-management differences. Before the enactment of the National Labor Relations Act, it was held that the duty of an em-

ployer to bargain collectively required the employer 'to negotiate in good faith with his employees' representatives; to match their proposals, if unacceptable, with counterproposals; and to make every reasonable effort to reach an agreement.' \* \* \* "

In State of California v. Taylor, 353 U.S. 553, 566, 77 S.Ct. 1037, 1044, 1 L.Ed.2d 1034, speaking of the Railway Labor Act and its machinery for conciliation, mediation, arbitration and adjustment of disputes, the court said:

> " \* · \* \* A primary purpose of this machinery of railway government is 'To avoid any interruption to commerce or to the operation of any carrier engaged therein \* \*.' \* \* \* "

and also

> " \* \* \* Its continuous operation is important to the national flow of commerce."

While in this case both parties recognize that collective bargaining between the Organizations and the Carriers is required by the Railway Labor Act, Virginian Ry. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, we know of no requirement as to precise form or method of such bargaining. For that reason, we conclude that the conferences between the respective parties on individual railroads, following the service on November 2, 1959 of the Carriers' notices, were steps in collective bargaining and that the same is true of the national conferences thereupon held and extending through October 17, 1960. Furthermore it is our opinion that the October 17, 1960 agreement between the Carriers and the Organizations providing for a commission, as hereinbefore set forth, is to be considered as another step in collective bargaining, especially inasmuch as it was expressly agreed that the Commission's mediatory efforts and report should be considered and accepted as in lieu of the somewhat similar procedure provided by the·Railway Labor Act.

In reviewing the history of the Carriers' notice of proposed rule changes on November 2, 1959, we find that these proposals were a proper subject of bargaining procedures and at all levels as required by law. Significantly the proffer of arbitration by the National Mediation Board, although accepted by the Carriers, was rejected by the Organizations.[4] While the Organizations participated in the various procedures, their refusal to conform to the results reached by the machinery set up for the purpose of avoiding interruption to commerce reduced their participation in the various steps of negotiation to a mere "sterile discussion" of differences, thus placing the Carriers in a position to exercise their prerogatives to unilaterally put into effect their proposed changes, unless proscribed by the Railroad Labor Act. National Labor Relations Board v. American Ins. Co., ante 11.

We have reached the following conclusions which are applicable to the situation now before us:

(a) There is an area in the administration of a railroad business in which management is free to operate without consultation with the representatives of its employees.

(b) The exercise of management's prerogatives is however subject to the employees' right to bargain collectively in areas covering rates of pay, rules and working conditions of the employees, and on the question whether these areas include the proposed rules before us relating to the operating employees of the railroad.

(c) When, after compliance with the procedural requirements of the Act relating to a proposed change in an existing agreement or the introduction of new terms where no agreement exists, resort to collective

---

4. Although they violated no legal obligation by their refusal. 45 U.S.C.A. § 157, First. Cf. Elgin J. & E. Ry. Co. v. Brotherhood of Railroad Trainmen, 7 Cir., 302 F.2d 540, 544.

bargaining fails without the fault of management, it may thereafter freely exercise its managerial prerogatives in such areas of operation as may have been up to then disputed.

2. While disclaiming any contention that a carrier may not, after complying with the procedural requirements of the Act and failing to reach agreement, change the rules governing the employment relation, the Organizations argue "that unilaterally established rules must be rules and not a 'rule' that there shall be no rules, and that such a 'rule' that there shall be no rules can be established, if at all, only by agreement".

In view of this contention we have examined the contents of the promulgation under attack and we find that a set of rules is contained in three articles entitled:

    I—Use of Firemen (Helpers) on Other Than Steam Power

    II—Basis of Pay and Assignment of Employees

III—Consist of Crews.

While the length of this opinion does not permit our including a reproduction of the material set forth in the promulgation, we have examined it carefully and find that it is a statement of detailed rules affecting the work and pay of the operating employees of the railroads. It is not in any way subject to the criticism of being a rule that there shall be no rules. Moreover, a rule regulating the work of operating employees on a railroad is by its nature subject to change. It is not like the immutable laws of the Medes and Persians. It is subject to alteration from time to time consistently with the duties of the carriers to the employees and the public which uses their lines.

■ We conclude that the promulgation of these rules was an act of management within the area in which the Carriers had a right to exercise their prerogatives without consulting or obtaining approval of the representatives of their employees, after the Carriers' required

submission to collective bargaining had been frustrated by the Organizations, although they had a legal right to do so.·

3. Having reached that conclusion, we are compelled by the course pursued by the Organizations through the various procedures, culminating in their rejection of a proffer of arbitration by the National Mediation Board, to hold that such conduct by the Organizations justified the railroads putting into effect the original rules reannounced in their promulgation of August 6, 1962.

■■ 4. The Organizations in this court make a separate attack upon the promulgation of August 6, 1962 by charging that it "is susceptible of the interpretation that it announces the repudiation of 'craft' or 'class' in certain situations, a concept at the very heart of the Railway Labor Act." However, the Carriers call our attention to the fact, which is not denied by the Organizations, that this contention was not raised in the district court, either by argument or in the complaint, as amended. This statement is not questioned by the Organizations in their subsequent reply brief. This contention comes too late now. However, we have given consideration to the point raised and as a result are of the opinion that the Carriers are right in the assertion which they have made, and which we repeat:

    " * * * The promulgation simply gives the carriers the right to determine the number of trainmen that shall be used in road train crews and of that number how many are to be assistant conductors, ticket collectors, baggagemen and brakemen. All such employees are now represented by the same organizations for purposes of collective bargaining. It likewise gives the carriers the right to use road crews in yard service and yards crews in road service; but the several classes or crafts involved are represented by the same organizations whether they work in road or yard service. It is clear, therefore, that the organizations' real complaint goes to the

carriers' assignment of work. The Railway Labor Act does not deal with this subject."

5. We are aware that the Organizations clearly informed the district court in their complaint, as amended, that

"If the defendants and the carriers represented by them proceed to put into effect the revisions contained in their second Promulgation, the plaintiffs will be forced to resist said revisions by asking those they represent who are employed by the carriers represented by the defendants to withdraw from the service of said carriers until said second Promulgation is cancelled. * * *"

We would like to believe that this unnecessary threat of a strike of such magnitude as to amount to a national transportation paralysis was ill-advised. If we are wrong in that assumption, then we shall remind the persons responsible that they are dealing with railroad properties which are impressed with a public interest, which is paramount to that of all the litigants in this case. Always invisibly present as a nonparticipating party, at the bargaining table and at every stage thereafter, have been the people of the United States, to whose interest that of the Organizations and the Carriers is subordinate. Through their representatives in congress, the people may resort to such governmental power as is necessary to assert their superiority to any private interest, whether corporate or otherwise. The Carriers enjoy a regulated monopoly in their field. The Organizations enjoy an immunity from the restrictions of antitrust laws. These references suggest only some of the ways in which the people might respond if any party to this suit resorts to an economic force which would jeopardize the nation, more than the opposing litigant in this case.

For the reasons which we have set forth herein, the order of the district court dismissing the complaint, as amended, and denying a motion for a preliminary injunction is affirmed.

Order affirmed