**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, an Unincorporated Association, et al., Appellants,**

v.

**CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a Corporation, Appellee.**

No. 17098.

United States Court of Appeals Eighth Circuit.

March 7, 1963.

Rehearing Denied April 3, 1963.

---

**1.** 95% of the freight handled by Deaton is Class 7 or lower.

H. E. Wilmarth, Cedar Rapids, Iowa, for appellants; V. C. Shuttleworth and W. R. Shuttleworth, of Elliott, Shuttleworth & Ingersoll, Cedar Rapids, Iowa, with him on the brief.

Jordan Jay Hillman, Chicago, Ill., for appellee; Frank W. Davis, of Davis, Huebner, Johnson, Burt & Fulton, Des Moines, Iowa, with him on the brief.

Before SANBORN, VAN OOSTER-HOUT and MATTHES, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

Plaintiff Chicago and North Western Railway Company (North Western) brought this action against the defendant labor organizations and officers thereof for declaratory judgment as authorized by 28 U.S.C.A. §§ 2201, 2202, to determine the rights of the parties with respect to the lawful procedures to be followed in adjusting seniority rights of employees affected by the consolidation of plaintiff's railroad yard with the newly acquired Minneapolis & St. Louis Railway Company (M. & St. L.) yard at Marshalltown, Iowa.

North Western and M. & St. L. are common carriers by railroad engaged in interstate commerce and are subject to the provisions of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., as well as the Railway Labor Act, 45 U.S.C.A. § 151 et seq. It is conceded that each of the railway employees affected by the consolidation is represented by a defendant labor organization. Railway Labor Executives' Association (RLEA) is the duly authorized representative of the defendant labor organizations.

Jurisdiction as asserted by reason of 28 U.S.C.A. § 1337 was challenged and upheld by the trial court. The issue presented is thus stated by the trial court:

"The basic question presented herein is, whether the parties are required to follow the procedures of the Railway Labor Act (45 U.S.C.A. § 151 et seq.) in effecting the proposed coordination of North Western's railroad yards at Marshalltown, Iowa, or whether the parties are required to follow the procedures prescribed by the 'stipulation' entered into by the parties and authorized by the Interstate Commerce Commission in its order approving the merger under the provisions of Section 5(2) (f) and Section 5(11) of the Interstate Commerce Act, 49 U.S.C.A. § 5(2) (f), 5(11)."

The trial court thus resolved such issue:

"1. That the Railway Labor Act (45 U.S.C.A. § 151 et seq.) is inapplicable to the proposed coordination of plaintiff's Marshalltown railroad yards.

"2. The parties hereto in carrying out the proposed coordination are required to follow the procedures prescribed by the stipulation entered into on August 4, 1960 and filed in Finance Docket No. 21115 before the Interstate Commerce Commission."

The trial court's well-considered opinion setting out the pertinent facts and applicable law is reported at 202 F.Supp. 277.

Defendants as a basis for reversal urge:

"I. The District Court erred in holding that it had jurisdiction of the controversy under Section 1337 of Title 28, U.S.C.

"II. The District Court should have dismissed the action as involving an abstract question.

"III. The Court erred in its ruling and judgment as to jurisdiction and as to the merits of the controversy."

As a background for the consideration of the errors asserted, we will set out some of the pertinent facts. There is no dispute between the parties as to the basic facts. On October 13, 1960, by order entered in Finance Docket No. 21115, the Interstate Commerce Commission (ICC), acting under § 5(2) of the Interstate Commerce Act, after considering appropriate applications on file and after due notice and hearing, entered an order authorizing North Western to acquire by purchase the railroad properties and operating rights of M. & St. L. The purchase authorized was consummated. North Western took over the operation of M. & St. L. on November 1, 1960.

The present controversy arising out of the aforesaid merger proceedings relates to the provision made for the protection of the employees and to the Commission's

right to make such provisions which conflict with existing collective bargaining agreements and the prescribed procedures set forth in the Railway Labor Act. The ICC report reads in part:

"Applicants also entered into a stipulation with railway labor organizations represented by the Railway Labor Executives' Association for the protection of all employees of the applicants whose bargaining representatives are members of the association. The stipulation is of the character contemplated by section 5(2) (f) of the act for the protection of railway employees who may be adversely affected by the transaction authorized. As to the employees covered by the stipulation, no conditions in our order are necessary."

The stipulation referred to in the report and order was made between North Western and M. & St. L. and RLEA, the authorized representative of the employees. Material portions of the stipulation are set out at pages 280, 281, 285 and 286 of 202 F.Supp. The stipulation followed generally the pattern of the Washington Job Protection Agreement of 1936,[1] with some modifications.

The stipulation provides "the Commission may accept this agreement as one providing a fair and equitable arrangement for the protection of the interests of such employes as provided in Section 5(2) (f) of the Interstate Commerce Act, as amended."

The stipulation incorporating the employees' agreement filed with the Commission states: "the protection of the interests of the employees of the carrier parties to the above-entitled proceeding has been provided by said agreement, and any report and order issued by the

Commission in said proceeding approving the application may so state."

The stipulation provides the basis for determining compensation to be paid employees adversely affected by the merger. Section 5 of the Washington Agreement, incorporated in and made a part of the stipulation, reads:

"Each plan of coordination which results in the displacement of employes or rearrangement of forces shall provide for the selection of forces from the employes of all the carriers involved on bases accepted as appropriate for application in the particular case; and any assignment of employes made necessary by a coordination shall be made on the basis of an agreement between the carriers and the organizations of the employes affected, parties hereto."

The stipulation further provides that in event a controversy cannot be decided as set out above, it may be referred to an arbitration committee composed of one member selected by each party and a third member to be selected by such members, or if they are unable to agree, either party may request the National Mediation Board to appoint a third member and that "the decision of the majority of the arbitration committee shall be final and conclusive."

On December 16, 1960, North Western gave notice in the manner prescribed in the stipulation that it contemplated coordinating its yard and the yard formerly operated by M. & St. L. at Marshalltown, Iowa, not earlier than March 17, 1961, and that such consolidation would result in the abolishment of one yard engine assignment (one engineer, one fireman, one foreman and two helper assignments). North Western also sent

---

1. The Washington Job Protection Agreement is an industry-wide collective bargaining agreement entered into by most railroads, including North Western and M. & St. L., and the labor organizations. It specifies conditions for the protection of employees in event of mergers. For further details as to the Washington Agreement, see Brotherhood of Mainte-

nance of Way Employes v. United States, 366 U.S. 169, 173, 81 S.Ct. 913, 6 L. Ed.2d 206; United States v. Lowden, 308 U.S. 225, 234, 60 S.Ct. 248, 84 L.Ed. 208; Railway Labor Executives' Ass'n v. United States, 339 U.S. 142, 147 et seq., 70 S.Ct. 530, 94 L.Ed. 721; and the trial court's opinion.

letters to the representatives of the yard employees requesting conferences contemplated by the stipulation for the purpose of reaching an agreement as to employees to be released and the solution of the labor problems flowing from the coordination. Numerous letters were exchanged between plaintiff and defendants wherein plaintiff contended that the controversy should be settled in the manner provided by the stipulation while defendants contended that the dispute must be handled under the provisions of § 6 of the Railway Labor Act. After it became apparent that any attempt to adjust the differences by negotiation would be futile, plaintiff invoked the arbitration provisions of the stipulation, notifying the defendants of the identity of its arbitrator, and plaintiff later requested the National Mediation Board to designate the neutral arbitrator pursuant to the stipulation provisions. Defendants, upon the basis that the Railway Labor Act controls, refused to name an arbitrator. The National Mediation Board did not act upon plaintiff's request that it appoint a neutral arbitrator.

■ Defendants' first point, to the effect that the court lacks jurisdiction, is without merit. The trial court states in its opinion, "The problem is not one of interpretation of collective agreements, but as heretofore set out, primarily involves the interpretation and effect of Section 5(11) of the Interstate Commerce Act on an agreement for the protection of employees approved by the Interstate Commerce Commission under Section 5(2) of the Act."

28 U.S.C.A. § 1337 confers jurisdiction upon federal courts over actions arising under any act of Congress regulating commerce. We agree with the contention of the parties that Gully v. First National Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70, prescribes the rules to be applied in determining whether an action arises under the provisions of the Interstate Commerce Act and the Railway Labor Act. Gully thus states the test of jurisdiction: "The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another." 299 U.S. 112, 57 S.Ct. 97, 81 L.Ed. 70. The problem of statutory construction here presented is a substantial one and fully satisfies the Gully test.

Defendants' contentions that the action should be dismissed as presenting only an abstract question and that the court erred in ruling upon the merits present complex problems of statutory interpretation and accommodation. Such issues are closely related and will be considered together.

It is agreed that the unification of the yards at Marshalltown will affect the seniority rights of the employees who are presently assigned to those yards. Their seniority rights arise out of separate collective bargaining agreements with North Western and M. & St. L., and consequently they do not apply uniformly to both groups of employees.

Defendants appear to regard the dispute as a major dispute which must be resolved, if at all, according to the procedures set out in § 6 of the Railway Labor Act. They urge that § 2, Seventh, forbids North Western to make any consolidation which alters seniority rights except in accordance with § 6.

We do not deem it necessary to determine whether the dispute here involved is major or minor within the meaning of the Railway Labor Act. For discussion of the distinction between major and minor disputes and the available remedies, see Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 722 et seq., 65 S.Ct. 1282, 89 L.Ed. 1886. See also Brotherhood of Locomotive Engineers v. Baltimore & O. R. R., 7 Cir., 310 F.2d 503. If either a major or minor dispute exists here and if the Railway Labor Act applies under the present factual situation, exclusive jurisdiction for resolution of the dispute would rest in the instrumentalities established by the Railway Labor Act.

■ The trial court held that "under the circumstances of this case the parties hereto in carrying out the consolida-

tion of yards are relieved from the requirements of the Railway Labor Act by virtue of Section 5(11) of the Interstate Commerce Act (49 U.S.C.A. § 5(11))." We thus direct our attention now to the basic issue of whether the statutory authority conferred upon the ICC by the Interstate Commerce Act to approve and facilitate mergers of carriers includes the power to authorize changes in working conditions necessary to effectuate such mergers.

Section 5 of the Interstate Commerce Act vests in the Commission broad powers to approve, authorize, and facilitate railroad mergers. Section 5(2) (b) includes the following:

"If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) of this paragraph and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable * * *."

Section 5(2) (c) (4) directs the Commission to consider the interests of the employees affected by a proposed transaction in determining whether the transaction is consistent with the public interest.

Section 5(2) (f) gives more particular consideration to the effects of the merger upon the railroad employees by providing in part:

"As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment * * *."

Section 5(11), the provision specifically relied upon by the trial court, states:

"The authority conferred by this section shall be exclusive and plenary * * * and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction. * * *"

Kent v. Civil Aeronautics Board, 2 Cir., 204 F.2d 263, also relied upon by the trial court, supports its decision. That case involved the merger of air carriers. The statutory provisions for protection of air carrier employees are very similar to those for the protection of railroad labor. See International Association of Machinists v. Northwest Airlines, Inc., 8 Cir., 304 F.2d 206, 211. The approval power for the merger of air carriers vested in the Civil Aeronautics Board is quite similar to that of the ICC in railroad merger cases. The basic problem presented in Kent was the jurisdiction of the Board to determine seniority rights of the flight engineers of the merging airlines. The court held that the Board's power to approve mergers carries with it, in furtherance of the public interest in effecting mergers, the right to resolve conflicting seniority rights of employees of the merging carriers. In response to the argument that

the order was invalid because it was in conflict with existing collective bargaining agreements, the court said:

"A private contract must yield to the paramount power of the Board to perform its duties under the statute creating it to approve mergers and transfers of certificates, such as are here involved, only upon such terms as it determines to be just and reasonable in the public interest. National Licorice Co. v. National Relations Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799; Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230; National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344.

"The paramount public interest required that due consideration be given conflicting seniority interests of both groups of these engineers. The Board has done that with meticulous care and, far from acting in an arbitrary and capricious way, has provided a method which fairly distributes the burdens and the benefits. Alternative methods suggested are at least no better and it was within the competence of the Board to make its determination free from private contract restraint." 204 F.2d 266.

In Brotherhood of Maintenance of Way Employes v. United States, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206, Mr. Chief Justice Warren, speaking for the Court, gave detailed consideration to the interpretation of § 5(2) (f) as it relates to the power of the Commission to impose conditions for the protection of employees. Appellants there contended that no compensation plan was adequate unless it was based upon the premise that all the employees currently on the payroll remain in the surviving carrier's employment for at least their prior length of service up to four years. The Court rejected such contention upon the basis of a detailed study of the legislative history of the statute and its administrative interpretation. Attention was called to the rejection by Congress of the Harrington amendment which, if adopted, would have brought about a freeze of existing employees in their job rights.

Railway Labor Executives' Association v. United States, 339 U.S. 142, 70 S.Ct. 530, 94 L.Ed. 721, involves another aspect of the interpretation of § 5(2) (f). The Court set out the legislative history of the statute which in our view lends much support to the trial court's interpretation of the statutes before us. The issue presented in the case just cited is whether the ICC had power in approving a merger to grant employees protection beyond the period of four years from the effective date of the approval of the merger. The Court answered this question in the affirmative. In discussing the legislative history, the Court states:

"The second sentence of § 5(2) (f) has a significant history of its own. On the floor of the House, Representative Harrington suggested the following proviso to follow the first sentence:

"'Provided, however, That no such transaction shall be approved by the Commission if such transaction will result in unemployment or displacement of employees of the carrier or carriers, or in the impairment of existing employment rights of said employees.'

"The Harrington Amendment thus introduced a new problem. Until it appeared, there had been substantial agreement on the need for consolidations, together with a recognition that employees could and should be fairly and equitably protected. *This amendment, however, threatened to prevent all consolidations to which it related.*" 339 U.S. 150–151, 70 S.Ct. 534–535, 94 L.Ed. 721. (Emphasis added.)

The Harrington amendment was defeated. We believe that the italicized sentence clearly points out the Court's view that the ICC power to authorize mergers would be completely ineffective if authority to adjust work realignments through fair compensation did not exist.

Such interpretation is supported by legitimate inferences flowing from the rejection by Congress of the Harrington amendment. Under the Railway Labor Act in a major dispute employees cannot be compelled to accept or arbitrate as to new working rules or conditions. Elgin, Joliet & Eastern Ry. v. Burley, supra; Brotherhood of Locomotive Engineers v. Baltimore & Ohio R. R., supra. Thus under the Railway Labor Act provisions, it is possible for either party to completely block any change in working conditions by refusing to agree to a change and by refusing to arbitrate. Like the Harrington amendment, the Railway Labor Act, if it applied, would threaten to prevent many consolidations.

In United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208, the issue was whether the ICC in approving a lease by one railroad to another has authority to prescribe as a condition that certain displaced employees be granted compensation. The case arose before the enactment of § 5(2) (f) in its present form. The Court recognized that under what is now § 5(2) (b) the welfare of affected employees was to be considered in determining the public interest. The Court held that the Commission had jurisdiction to impose conditions for the protection of the affected employees. The Court stated that the Commission had estimated that 75% of the savings resulting from consolidations will be at the expense of railroad labor. The Court states:

> "Not only must unification result in wholesale dismissals and extensive transfers, involving expense to transferred employees, but in the loss of seniority rights which, by common practice of the railroads are restricted in their operation to those members of groups who are employed at specified points or divisions. It is thus apparent that the steps involved in carrying out the Congressional policy of railroad consolidation in such manner as to secure the desired economy and efficiency will unavoidably subject rail-

road labor relations to serious stress and its harsh consequences may so seriously affect employee moral as to require their mitigation both in the interest of the successful prosecution of the Congressional policy of consolidation and of the efficient operation of the industry itself, both of which are of public concern within the meaning of the statute." 308 U.S. 233, 60 S.Ct. 252–253, 84 L.Ed. 208.

The Court also observed:

> "If we are right in our conclusion that the statute is a permissible regulation of interstate commerce, the exercise of that power to foster, protect and control the commerce with proper regard for the welfare of those who are immediately concerned in it, as well as the public at large, is undoubted. * * * Nor do we perceive any basis for saying that there is a denial of due process by a regulation otherwise permissible, which extends to the carrier a privilege relieving it of the costs of performance of its carrier duties, on condition that the savings be applied in part to compensate the loss to employees occasioned by the exercise of the privilege." 308 U.S. 240, 60 S.Ct. 255–256, 84 L.Ed. 208.

While the three Supreme Court cases just discussed do not deal directly with the specific problem now confronting us (namely, whether the provisions relating to merger and providing for compensation for affected employees take precedence over the provisions of the Railway Labor Act) in the situation here presented we believe that the cases afford very substantial support for the view that Congress intended the ICC to have jurisdiction to prescribe the method for determining the solution of labor problems arising directly out of approved mergers. Thus, like the trial court, we come to the conclusion that to hold otherwise would be to disregard the plain language of § 5(11) conferring exclusive and plenary jurisdiction upon the ICC to approve mergers and relieving

the carrier from all other restraints of federal law.

Unquestionably, the Railway Labor Act is a federal law. We find no express or implied exception of the provisions of the Railway Labor Act from the operative provisions of § 5(11).[2]

■ The defendants argue that even if it be assumed (which is not conceded) that the ICC had jurisdiction under § 5(11) to render the provisions of the Railway Labor Act inoperative, it did not exercise such jurisdiction. While the carriers asked ICC to relieve them from the restraint of federal law, the Commission made no express finding or order to such effect. Thus defendants urge that only an abstract question is presented. In answer to a similar defense, the Commission in Chicago, St. P., M. & O. Ry. Lease, 295 I.C.C. 696, states:

"We find nothing in that paragraph [§ 5(11)], or in other portions of section 5, which authorizes us to determine and declare the particular laws within the scope of paragraph (11) from which a carrier shall be relieved. The terms of this paragraph are self-executing, and there is no need for this Commission expressly to order or declare that a carrier be relieved from certain restraints. It is sufficient if we make clear what the carrier is authorized to do."

We agree with the views just expressed. The Commission did actually approve the proposed merger and the included agreement for the protection of railroad employees as it was authorized to do. Such approval, in absence of language manifesting a contrary intent, carried with it any exemption from the restraints of other laws as contemplated by § 5(11) to the extent necessary to carry out the merger. We reject defendants' contention that the statutory interpretation problem before us presents only an abstract question.

Defendants further urge that the Commission made no finding that it was exercising a right to modify the collective bargaining agreements. The Commission did in fact prescribe the terms of compensation to be paid employees affected by the merger and the machinery agreed to by the parties for resolving any dispute that might arise in connection therewith. We have heretofore held that the Commission had jurisdiction to do so. As heretofore pointed out, the Commission at the express invitation of the carriers and the employees adopted the method agreed upon by them for solving any labor dispute which might arise out of displacement of employees as a result of the merger. The Commission found such agreement to be of the character contemplated by § 5(2) (f). It is apparent from the Commission's report and order that it considered the agreement which it had approved to have satisfied the obligations resting upon the Commission to protect the employees affected by the merger. Since the parties had completely agreed upon this matter in a manner which satisfied the Commission, no occasion arose for the ICC to take any further action with respect to specifying the conditions. Doubtless the Commission has a broad discretion in determining what conditions should be imposed for the protection of labor and the method of working out any dispute that might arise in connection therewith. It is entirely possible that under some circumstances, the Commission would deem it best to leave the resolution of the dispute to the Railway Labor Act machinery. However, such course was not adopted here. The ICC merely approved

2. As appellee points out in its brief, Congress has demonstrated by the proviso it attached to Title I, § 10 of the Emergency Railroad Transportation Act of 1933 (48 Stat. 211–17) that it knows how to expressly exclude the Railway Labor Act from the operation of a statute such as this. As the Supreme Court points out in Texas v. United States, 292 U.S. 522, 534, 54 S.Ct. 819, 825, 78 L.Ed. 1402 (dealing with other sections of the 1933 Act), "The insertion of the provision in Title I, with its restricted application, and the omission of a similar provision from Title II, indicate an intentional distinction."

the solution of the problem which had been agreed upon by the parties.

Thus, it is our view that the stipulated agreement became part of the conditions which § 5(2)(f) requires the Commission to impose for employee protection.

Defendants did not treat the stipulation as being an amendment to their collective bargaining agreement when North Western acted to consolidate the Marshalltown yards. Defendants took the position that the notice was a § 6 notice for new contract provisions.

No question is raised as to the authority of the labor signers of the stipulation to act, nor is any attack made upon the fairness or adequacy of the stipulation. In effect the stipulation provides substantially the same machinery for arbitration that exists under § 7 of the Railway Labor Act in the event of an agreement of the parties to arbitrate after negotiations for adjustment under other provisions of the Railway Labor Act have failed. The ICC has many times provided for compulsory arbitration to settle labor disputes arising out of mergers where the parties have been unable to agree. See Arnold v. Louisville & Nashville R. R., D.C.M.D.Tenn., 180 F.Supp. 429, 435–436.

In New Orleans & Northeastern R. R. v. Bozeman, 5 Cir., 312 F.2d 264, the court, in approving a merger, imposed the so-called "Oklahoma conditions" for the protection of affected employees. Said conditions included a provision for compulsory arbitration of disputes relating to employees discharged as a result of the merger. The parties were unable to settle a dispute which arose from the dismissal of some employees. The railroad contended that under the Railway Labor Act it could not be compelled to arbitrate the question. The court, after stating that it found no authorities directly passing upon a complaint to compel arbitration in such a situation, states:

"We conclude that Section 8 of the Conditions gave either party the absolute right to select arbitration as a means for settling the dispute and when such selection was made then arbitration was mandatory on the other party. We also conclude that the [employees] made this election, as found by the trial court, and we find that there is no prohibition in the statute against giving effect to this term of the I.C.C. order."

■ We consider the Bozeman case to be based upon sound reasoning. Said decision affords substantial support for the trial court's decision. The fact that in Bozeman the employees were seeking arbitration while here arbitration is sought by the railroad is a distinction without difference under the peculiar facts of this case. In Bozeman, the railroad was bound to arbitrate because it accepted the merger upon the conditions imposed by the Commission which included compulsory arbitration. Here both parties are bound by their voluntary agreement to arbitrate merger labor disputes, which agreement was approved by the Commission and made a part of the § 5(2)(f) conditions.

■ The Railway Labor Act fosters no overriding policy or purpose which would deny enforcement of an agreement to arbitrate. See Brotherhood of Locomotive Engineers v. Baltimore & O. R. R., 7 Cir., 310 F.2d 503, 507, 511; Dwellingham v. Thompson, D.C.E.D.Mo., 91 F.Supp. 787, 792, aff'd sub nom Rolfes v. Dwellingham, 8 Cir., 198 F.2d 591. See also Brotherhood of R. R. Trainmen v. Chicago River & Ind. R. R., 353 U.S. 30, 34–35, 77 S.Ct. 635, 1 L.Ed.2d 622.

On the other hand, the situation here is distinguishable in many respects from that presented in Texas & New Orleans R. R. v. Brotherhood of Railroad Trainmen, 5 Cir., 307 F.2d 151. There the Norris-LaGuardia Act was also invoked and the railroads had actually instituted § 6 proceedings to change the contract. That case did not present a situation such as we have here, where both carriers and labor have joined in an agreement for the adjustment of labor disputes which would arise out of the approved merger. See also McDow v. Louisiana So. Ry., 5 Cir., 219 F.2d 650.

Other issues are raised. We deem what we have said heretofore to be dispositive of this case. The result to be reached is often governed by the precise factual picture presented. We limit our decision to the peculiar factual situation of the present case.

We hold that the court had jurisdiction; that a justiciable controversy on statutory construction was presented; that the court committed no error in holding that the Commission acted within its jurisdiction in providing for the adjustment of labor disputes arising out of the approved merger; and that the court correctly decided the parties to this action should follow the procedures prescribed by the stipulation approved and adopted by the Commission.

Affirmed.