## WILLIAMS et al. v. JACKSONVILLE TERMINAL CO.

No. 9754.

Circuit Court of Appeals, Fifth Circuit.

March 4, 1941.

HOLMES, Circuit Judge, dissenting.

Frank F. L'Engle, of Jacksonville, Fla., for appellants.

Julian Hartridge, of Jacksonville, Fla., and John Dickinson, of Philadelphia, Pa., for appellee.

Irving J. Levy, Asst. Sol. in Charge of Litigation, Dept. of Labor, of Washington, D.C., and John E. Skilling, Atty., Dept. of Labor, of Washington, D.C., for amicus curiae.

Before FOSTER, SIBLEY, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

This suit was brought under Section 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 201–219, in behalf of the station porters, called red caps, who worked at the Jacksonville Terminal between Oct. 24, 1938, the date the Act went into effect, and July 1, 1940, when a new wage arrangement was put into effect, to recover unpaid wages and an equal amount as liquidated damages. The main facts were admitted or stipulated, and on motions for summary judgment made by each side the decision was against recovery, and the red caps appeal.

Prior to October, 1938, these red caps, like others at many larger railroad terminals throughout the United States, were selected on their applications, by Jacksonville Terminal Company, furnished with uniforms which included red caps, and permitted to offer their services especially as porters of hand baggage to the passengers taking or leaving trains; they to look wholly to the passengers for their pay, but not to demand or argue about it but to take what was offered. The Terminal Company regarded the red caps not as employees, but as licensees permitted to do their own business on its premises on the conditions it laid down. On September 29, 1938, the Interstate Commerce Commission made a decision, Ex parte No. 72, 229 I.C.C. 410, that the red caps were employees for the purposes of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., and entitled to organize as such. If employees, they would on October 24, become entitled to wages not less than twenty-five cents per hour for one year, and thirty cents per hour thereafter, under the Fair Labor Standards Act, Sect. 6, 29 U.S.C.A. § 206. In recognition of this the Jacksonville Terminal Company, (as did other terminal companies), gave each red cap a written notice which referred to the Act and stated that in consideration of engaging in the handling of hand baggage and assisting passengers otherwise, the red cap must report daily to the Terminal Company "the amounts received by you as tips or remuneration for such services";

and that the Terminal Company guaranteed to each person continuing such service after October 24, 1938, compensation which, including the sums above referred to, would not be less than the minimum provided by law; that tips or remuneration in excess of the minimum wage and taxes might be retained by the recipient; and the right to make rules and regulations for the service and the accounting was asserted by the Terminal Company. The red caps claimed to be already organized for collective bargaining and their representative did not wish this "accounting and guaranty" plan of payment to be entered upon independently of a collective agreement with the red caps. No collective agreement was reached for about a year, and then it did not cover wages, there being an understanding that the validity of the accounting and guaranty plan under the law should be determined by the courts. In the meanwhile the red caps continued to serve and did account for their tips as required, until on July 1, 1940, another plan was put into effect whereby the Terminal Company directly paid fixed wages, and required the red caps to collect from passengers and turn in ten cents per parcel handled, under a system of baggage checks. Some of the red caps had received between October 24, 1938, and July 1, 1940, more than minimum wages in tips and were paid nothing besides. All others had their deficits made up by the Terminal Company. In the aggregate, the Company had supplemented tips by an amount of $8,321; and tips amounting to $3,019 in excess of minimum wages had been retained by the recipients. Each red cap had received money equal to the minimum wage, or more. But the red caps say they never did agree expressly to this plan of payment, and outside of the $8,321 they have been paid nothing by the Company, the tips being their own money. They claim a sum of $59,923. The Terminal Company contends that the tips, especially after the notice, were the income of its own business, that the red caps have been fully paid with the Company's money, and that to require triple payment would be "legal brigandage". We think the vital question is, Whose money were the tips?

We will not stick upon the general meaning of the word "tip". Webster's International Dictionary makes the tip to be a gift, a fee; and defines a fee as a compensation for service rendered. The Standard Dictionary says a tip is money given, as

to a servant, to secure better or more prompt service. It would seem that a tip may range from a pure gift out of benevolence or friendship, to a compensation for a service measured by its supposed value but not fixed by an agreement. Most often the term is applied to what is paid a servant in addition to the regular compensation for his service, to secure better service or in recognition of it. But the Fair Labor Standards Act makes no reference to "tips", and the notice given the red caps refers to "tips or remuneration". We are not concerned with the proper meaning of the word, but with the legal status of what the passengers paid these red caps, by whatever name called. Along with dictionary definitions, we put aside a number of decisions cited about the ownership of tips, somewhat conflicting, because each dealt with its own kind of tip and none from an appellate court dealt with money paid a red cap by a passenger.

 This record makes no effort to prove or agree on the actual intention of passenger, red cap, or Terminal Company, when at any time a porter service was rendered and remunerated. It is left to common knowledge and reasonable inference. Railroad travel is so general and red cap service so familiar that it may well be considered, as it touches the passenger, a matter of common knowledge. We so deal with it. Before the day of red caps the passenger depended for assistance on the chance presence of some jobless person, and paid him for his help. The red caps took the place of the jobless ones at large terminals, and rendered a supervised service; but the railroad carriers were not bound to afford any such service to the passenger, and the reward of it was left a matter between red cap and passenger, with the stipulation that the amount should be left to the passenger and there should never be annoyance or embarrassment about it. It may be that the red caps were always employees of the Terminal Company in that it selected them and was probably answerable for their honesty and carefulness; but they were not employees for wages, their time and efforts were their own, and what they earned belonged to them. Passengers understood this; they knew that what they paid did not go to the Terminal Company, but was the meat and bread of the red cap. What they paid was influenced by the generosity and wealth of the passenger as well as by the number and weight of his bags, and at times by the needy appearance or the cheerfulness and promptness of the red cap. But in every case the tip was primarily a compensation for service, and not a gift. The red cap expected nothing unless he served. No passenger ever gave a red cap anything unless there was service. Every passenger paid for service unless he or she was very stingy or financially unable, or else ignorant that pay was expected. The acceptance of service carried an expectation of reward on both sides. What the red cap received was not gifts but earnings. If they amounted to enough he owed income taxes on them; and they belonged to him, either because the business was his, or if an employee, because his employer conceded them to him.

 A great change occurred October 24, 1938. The red caps had successfully established a status as employees and a right to organize. The Fair Labor Standards Act said that as employees they are ipso facto on wages whose amount should not be less that fixed sums per hour. Since the employer became absolutely bound to pay these sums for those hours and for the labor to be done in them, necessarily the work was his, and the product of it was his. The employer did not have to consent to this, nor did the employee. The law made the change for both. By merely maintaining their relationship each became bound by the law. Because what was received from passengers was not gifts but pay for services valued by the passenger, it required no consent on the part of the red caps to make the earnings belong to the employer, who was now bound to pay for the time and efforts of the red caps during work hours. The red cap's reward was to be wages. The employer became entitled to his services and what was received for them. The notice given the red cap was sufficient to make his receipts the money of the employer.

The passengers after October 24 still paid for service as before; but whether they realized it or not, they were now paying the Terminal Company for it. If they knew, they might have paid less, but the elimination of the human symphathy element would only make it more clear that what was paid was for service—not a gift. A pure gift, if one were ever made, would still belong to the red cap unless controlled by special arrangement with the employer, but the burden would be on the red cap to prove a gift in special instances. None are proven here.

The Act undoubtedly contemplates that the employee shall be paid his wages by the employer out of the employer's funds. But it does not prohibit the employee being given the duty of collecting the employer's money, and the privilege of paying himself out of it, subject to accounting, provided the employer stands ready to promptly pay any balance due the employee. For example, an interstate trolley company might authorize its conductor to collect cash fares, and account for them thus. The fares would belong to the employer, but the conductor might take and spend them to the extent of his wages, because the employer had authorized it. Otherwise he could not. We perceive no breach of the minimum wage provisions of the law in such an accounting arrangement fairly and promptly carried out. But we are far from saying that it is desirable. It is said in this record that as applied to red caps it has sometimes resulted in their reporting more tips than they received with a purpose to hold their jobs, and so lost part of their wages. Under Section 11(c) of the Act, 29 U.S.C.A. § 211(c), the Administrator has large power over the question of records, including accountings, and if the Administrator should find that any system of accounting practically interferes with the working of the Act, he could consider what regulation he should make. We do not think the Act condemns ipso facto all payment of wages by accounting, or requires us to say that although the employee got all he ought to have had of his employer's money, the employer must pay again because the employee was allowed to keep what was in his possession instead of paying it to the employer and receiving it back again.

The provision of Section 3(m), 29 U.S.C.A. § 203(m), " 'Wage' paid to any employee includes reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities * * *", refers to wage payments other than in money, and has no bearing upon the case. No credit on wages is claimed by reason of anything furnished, except the money retained by the employee. The uniforms furnished the red caps as clothing might come within the definition, but the terminal and its trucks and rolling chairs and its equipment are not facilities furnished. The last named are not furnished to the red caps as their facilities, but are things which the employer keeps for use in his own business, and which he employs the red cap to use. The recompense for them is to come not from the wages of the red caps, but from the income of the business, including the collections by the red caps from the passengers.

When it is clearly apprehended that red cap tips are not personal gifts, but compensation for service which since October 24, 1938, is rendered by the red caps for the Terminal Company, for a wage which the Terminal Company is absolutely bound to pay, it becomes plain that the tip money is the money of the Terminal Company, irrespective of the consent of the red caps; and when they are paid their wages in part or in whole out of it, they are not paid with their own but their employer's money.

Judgment affirmed.

HOLMES, Circuit Judge (dissenting).

The adage that hard cases make bad precedents is very true. I am afraid the adage is exemplified in this case, but the principle involved is more important than the amount of money sought to be recovered.

This case turns largely upon the meaning to be given the word *tips*. If what the red caps received were gifts or gratuities, they had the right to keep them for themselves. Whatever moral compulsion one may have been under to tip red caps, Pullman porters, or other employees, there was no legal obligation to do so during the period here involved. I think if Congress had intended that tips should be included in the meaning of the word *wages* it would have said so.

The majority opinion is not concerned with the proper meaning of the word tips. It says: "Along with dictionary definitions, we put aside a number of decisions cited about the ownership of tips, somewhat conflicting, because each dealt with its own kind of tip and none * * * dealt with money paid a red cap by a passenger."

The general rule is that words should be given their usual and ordinary meanings, unless the contrary clearly appears from the circumstances in which they are used. I dissent for the above and the further reasons fully stated by the district court in its opinion reported in Pickett v. Union Terminal Co., D.C., 33 F.Supp. 244.