### RAILROAD YARDMASTERS OF AMERICA
v.
### ST. LOUIS, SAN FRANCISCO AND TEXAS RAILWAY COMPANY.
#### Civ. A. No. 4695.

United States District Court
N. D. Texas,
Fort Worth Division.
April 10, 1963.

Mullinax, Wells, Morris & Mauzy, Dallas, Tex., for plaintiff.

Allen, Gambill & Gambill, Fort Worth, Tex., Burford, Ryburn & Ford, Dallas, Tex., Martin M. Lucente, Chicago, Ill., Ernest D. Grinnell, Jr., St. Louis, Mo., for defendant.

BREWSTER, District Judge.

This case involves another phase of what Mr. Justice Clark, in Order of Railroad Telegraphers v. Chicago & N. W. R. Co., 1960, 362 U.S. 330, 342, 80 S.Ct. 761, 4 L.Ed.2d 774, 784, referred to as the "financial headaches" of the railroads, which management and labor, collectively, claim is attributable in part to the failure of managerial, financial, operational and work standards to keep pace with the technological improvements in the industry. The controversy in the present case arose from actions of the railroad designed to eliminate what it considered an obsolete employee classification without first bargaining with the certified union.

The suit is by the Railroad Yardmasters of America, herein called "Union", against the St. Louis, San Francisco and Texas Railway Company, herein called "Railroad", for an injunction and a declaratory judgment. The relief prayed for is in substance:

(a) that the Railroad be enjoined from abolishing the classification of yardmaster at its Fort Worth yards and elsewhere, or from transferring the duties of such classification to other of its employees outside the bargaining unit represented by the Union, unless and until the Railroad shall have complied with the requirements of the Railway Labor Act as to notice, collective bargaining, negotiation, mediation and other necessary procedures;

(b) that a judgment be granted declaring that any unilateral action of the Railroad in abolishing the yardmaster classification, or in transferring the duties of said classification to other of its employees outside the bargaining unit represented by the Union, will be in violation of the Railway Labor Act.

The Railroad urges the following defenses:

1. It has the right to discontinue yardmaster positions upon 48 hours advance notice under Rules 15 and 16(e) of its collective bargaining agreement with the Union.

2. The Union and the particular yardmasters involved have not complied with the grievance procedure set out in Rules 11 and 12 of the collective bargaining agreement.

3. The dispute involved is only one over the interpretation of an existing agreement, and is therefore a minor dispute exclusively within the jurisdiction of the National Railroad Adjustment Board established by Section 3 of the Railway Labor Act. 45 U.S.C.A. Sec. 153.

4. The Union and the particular yardmasters involved have an adequate remedy at law.

It is important to point out in the beginning that the Union has not put in litigation the question of whether the Railroad can abolish individual yardmaster *positions* without securing the consent of the Union. Its claim here is only that the Railroad cannot take unilateral action designed to eliminate the yardmaster *classification*, without having given notice under Section 6 of the Railway Labor Act and having exhausted the negotiation and mediation procedures under that Act.

The Court has jurisdiction of this case under 28 U.S.C.A. Sec. 1337. Brotherhood of Locomotive Engineers v. Baltimore & Ohio R. Co., 7 Cir., 1962, 310 F.2d 503, affirmed, 1963, 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759; Order of Railroad Telegraphers v. Chicago & N. W. R. Co., supra.

Both parties hereto are subject to the provisions of the Railway Labor Act. 45 U.S.C.A. Sec. 151 et seq. The fundamental question involved is whether the dispute is major or minor within the decisions construing the Act. If it is minor, the Union cannot maintain this action here, but must present its complaint to the National Railroad Adjustment Board. On the other hand, if the dispute is major, the Union is entitled to the relief prayed for in this case.

The Union is an unincorporated association organized for the purposes and objectives of a labor organization rep-

resenting the class or craft of railroad employees which includes yardmasters. In May, 1945, the National Mediation Board certified that the Union was duly designated and authorized to represent the class or craft of yardmasters employed by the Railroad for the purposes within the purview of the Railway Labor Act.

The Railroad here is a unit in an affiliation of common carriers which make up what is known as the "Frisco System", sometimes referred to herein as the "Frisco". The St. Louis-San Francisco Railway Company is the parent company and the principal owner. The third one is the Alabama, Tennessee and Northern Railroad Company. The three companies are under common ownership by permission of the Interstate Commerce Commission to the extent that they can so operate under existing laws. They are related by management, and operate as a unit to the extent permitted by law. The Frisco system as a whole, and each of its constituent companies in particular, operates as a common carrier by railroad engaged in interstate commerce. The Frisco serves an area which includes Texas, Missouri, Oklahoma, Arkansas, Tennessee, Alabama and Florida. It is an important part of the national transportation system. The defendant in this case, the St. Louis, San Francisco and Texas Railway Company, is necessarily chartered under the laws of Texas to comply with Article 6260, Vernon's Annotated Texas Civil Statutes. A portion of the Texas subsidiary's interstate system, including its home office and one of its railroad yards or terminals, is located in Fort Worth, Texas.

The same certification of the Union and the same collective bargaining agreement relate to all of the units in the entire Frisco system.

One of the classifications of employees engaged by the Railroad is that of "Yardmaster". The work of such classification is now and for the foreseeable future will be necessary to the conduct of the Railroad's operation. There is presently in effect between the Union and the Railroad a collective bargaining agreement covering the duties, wages and working conditions of yardmasters of all grades involved in this case. The agreement, as amended from time to time, has been in force since 1945. The last revision was effective February 1, 1957. The agreement has never been terminated.

The 1957 version of the "Rules of Transportation Department" sets out in detail the duties of the various employees engaged in the actual operation of the Railroad. The rules are in a bound, printed booklet, which has on its cover the title: "Rules of the Frisco System". Such printed rules are no part of the collective bargaining agreement, and do not constitute any agreement between the Railroad and its employees; but the 1927 version of such rules was in effect at the time the present collective bargaining agreement was made. Insofar as the questions in this case are concerned, there has been no substantial difference in the various publications of the "Rules of the Transportation Department" from 1926 to date. The following is quoted from such rules to show the nature of work required of yardmaster in the Frisco system:

"816. At stations where yardmaster is employed, trains and engines will be under control of yardmaster, and all employees in train, yard and engine service will be subject to his direction. Road crews of trains in such yards will be responsible for their respective trains and engines until same are taken charge of by the yardmaster or his representative."

"825. Yardmasters will report to the general yardmaster, trainmaster, assistant superintendent or superintendent. They have charge of the yards assigned to them and have supervision of all yard employees and other train and engine men when within yard limits. They will require the proper discharge of duty and observance of rules by all employes subject to their direction.

"826. They are responsible for making up and dispatchment of passenger trains on schedule. Where switching is performed on passenger trains, they will arrange for engine to be available and for the work to be done promptly.

"827. They are responsible for the making up of freight trains with proper tonnage and will arrange to have train properly classified, checked and inspected before leaving time. They will see that conductor is provided with waybills for loaded cars and billing and home route cards for empty cars. They will see that freight assigned to particular trains is forwarded in such trains.

"828. They are responsible for compliance with requirements as to diversions, refrigeration, ventilation and heating of cars of perishable freight, the safe and proper handling of explosives and flammables and the prompt handling of livestock to prevent over-confinement.

"829. They must, unless otherwise provided:

"See that notices are posted on bulletin boards, and that all obsolete notices are removed.

"Arrange for proper inspection of cars; and that cars requiring repairs or transfer are promptly placed and moved after repairs or transfers are completed.

"Require daily check of waybills racks and see that all cars are moved promptly.

"Make prompt wire report of all accidents and personal injuries.

"See that engine and train men are ready to leave at the appointed time."

On or before October 8, 1962, the Railroad determined to abolish the classification of yardmaster at its Fort Worth yards, and to transfer the duties of said classification to other of its employees outside the bargaining unit represented by the Union. For the purpose of carrying out that plan, the Railroad gave written notice on the above mentioned date to General Yardmaster J. R. Joplin, Jr., Second Yardmaster J. D. Choate, and Third Yardmaster A. C. Mitchell, that the positions held by them would be abolished at the end of their respective tours of duty on October 10, 1962. It was also the intent of the Railroad to abolish the position of Relief Yardmaster held by Roy H. Kendall. The persons named were all of the yardmasters employed by the Railroad in its Fort Worth yards. They were members of the class or craft represented by the Union, and were covered by the bargaining agreement heretofore mentioned. The effect of the plan, if carried out, would have been to eliminate completely the classification of yardmaster, and to transfer the duties of the yardmaster classification to other employees of the Railroad outside the bargaining unit represented by the Union.

The elimination of the four yardmaster positions in the Fort Worth terminal and of the yardmaster classification in general is not made necessary by lack of need for performance of duties heretofore assigned to them, or by anticipation of any reduction in volume of yard traffic. There is no present intention to close the Fort Worth yard. The work of the yardmaster is necessary to the operation of the railroad. It is work that involves discretion and judgment; and it requires experience and training. Under the proposed change, the work would continue; but it would be done by clerks, engine foremen and other employees, with the help of IMB machines. The yardmaster duties would be new and increased responsibilities for those employees, and none of them belongs to the bargaining unit represented by the Union which brought this suit. The Railroad intends to go ahead with the plan, if permitted to do so, even if the volume of traffic increases. It is anticipated that the present force, without the yardmasters, will be adequate to absorb their duties.

There is no more reason for eliminating the classification of yardmaster in the Fort Worth terminal and having its duties absorbed by employees of other bargaining units than there would be for so doing in any other yard in the Frisco system. Insofar as the questions in this case are concerned, the conditions affecting the need or lack of need for the yardmaster classification are not substantially different from those existing throughout such system.

The proposed change in the Fort Worth terminal is not the only action of that type which has recently occurred in the Frisco system. Similar moves have been made in yards in Fort Smith, Arkansas; in Enid, Oklahoma; and in Cape Girardeau, Missouri. That there were even additional ones in terminals not specifically identified is indicated by the following fact laden question asked by counsel for the Railroad of the Union's witness Schoch, after interrogation about the yards above mentioned, and by the answer thereto:

"Q   There are other places on the Frisco involving yard operations where yardmasters once were employed and are now no longer used, isn't that correct?

"A   Yes, I believe there are several."

1500 yardmaster positions have been abolished on American railroads as a whole since 1956.

■■■ The Court's inferences and deductions may be drawn from the evidence and from matters of which judicial notice may be taken. "The railroad business is of such magnitude and so vitally interwoven with the every day affairs of men that courts will take judicial notice of its general features." 31 C.J.S., Evidence, § 29d(2) (a), p. 564, citing as authority Williams v. Jacksonville Terminal Co., 5 Cir., 1941, 118 F.2d 324, 326, affirmed 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914, and Old Colony Bondholders v. New York, N. H. & H. R. Co., 2 Cir., 1947, 161 F.2d 413, cert. den. 331 U.S. 850, 67 S.Ct. 1754, 91 L.Ed. 1865. Such

judicial notice includes general facts of common knowledge relating to the construction, maintenance, equipment, operation and financial condition of railroads. 31 C.J.S., Evidence, § 29d(2) (b), p. 566; Williams v. Jacksonville Terminal Co., supra; Old Colony Bondholders v. New York, N. H. & H. R. Co., supra; Van Schaick v. McCarthy, 10 Cir., 1941, 116 F.2d 987; In re Chicago & N. W. R. Co., 7 Cir., 1942, 126 F.2d 351, cert. den. Chicago & N. W. R. Co. v. Mutual Savings Bank Group Committee, 318 U.S. 793, 63 S.Ct. 987, 87 L.Ed. 1158; New York C. & St. L. R. Co. v. Frank, 1941, 314 U.S. 360, 371, 62 S.Ct. 258, 86 L.Ed. 277, 284.

The Supreme Court, in New York C. & St. L. R. Co. v. Frank, supra, said of the affiliated companies making up the Nickel Plate Road: " *   *   * It was a matter of common knowledge that the constituent companies were heavily in debt for which no provision had been made other than by attachment to the new corporation under state law.   *   *   *" 314 U.S. at 371, 62 S.Ct. at 263–264, 86 L.Ed. at 284.

Old Colony Bondholders v. New York, N. H. & H. R. Co., supra, said of the railroad there involved that, " *   *   * the court may take judicial notice that war earnings have ended and costs of labor and materials have advanced." 161 F.2d at 423.

Van Schaick v. McCarthy, supra, holds that: " *   *   * The court will take judicial knowledge of the fact that local traffic has largely been taken over by buses and trucks, and that railroads today must depend largely upon through traffic." 116 F.2d at 991.

Michelsen v. Penney, 2 Cir., 1941, 135 F.2d 409, and Humble Oil & Ref. Co. v. Luckel, Tex.Civ.App., 154 S.W.2d 155, error refused, want of merit, do not involve railroads; but they support the principle of the other cases above cited.

■■■ The Court will take judicial notice that there has been great progress in automation and technology in the railroad industry in the past quarter of a

century; that the other phases of such industry have not kept pace with that progress; and that both railroad management and labor face extremely serious problems, financial and otherwise, as a result thereof requiring joint consideration to reach a solution that will make it possible for the industry and its workmen to survive.

It is a logical deduction from the evidence admitted in this case, and from the above stated matters of which the Court takes judicial knowledge, that the Railroad regards the entire classification of yardmaster as being obsolete; that it has felt and now feels that abolition of the classification and absorption of its duties by other employees would eliminate waste; and that it plans to get rid of the classification by releasing the yardmasters terminal by terminal in its lines. It is further concluded that the plan was part of an over-all one applicable to the Frisco system.

A yardmaster attains his position by progress through lower jobs, such as those of engine helper and foreman. The result is that he usually has seniority over employees in the lower classifications, and is entitled to displace one of them with lesser seniority, if his job as yardmaster plays out. The other classifications are outside the collective bargaining unit represented by the Union. The displaced employees would have the same right to assert seniority over those in lower classifications in the yard. Those conditions existed in relation to each of the individuals involved in this case. The chain reaction which would result from the abolition of the yardmaster classification is readily apparent.

The Railroad has been and is attempting to effect the change here involved unilaterally, without giving notice to the Union under Section 6 of the Railway Labor Act, and without any intention or attempt to comply with any of the procedures provided by the Act for helping settle major disputes.

No claim or grievance as to the Railroad's plan and effort to abolish the yardmaster classification has been filed by any party, either through the procedures of the Railway Labor Act in connection with the National Railroad Adjustment Board, or through those set up in Section 11 of the collective bargaining agreement.

The Court granted a temporary restraining order. When the case was heard on its merits, the parties asked for time to submit briefs; and it was agreed between them that the status quo as to the four yardmasters named in the complaint would be maintained until the judgment by this Court on the merits.

The Railroad would have put its plan into effect on October 11, 1962, if the temporary restraining order had not been granted. The status quo has been maintained only as a result of the above mentioned agreement. If a permanent injunction is not granted, the Railroad will proceed unilaterally to carry out its plan, with the result that the Union will suffer irreparable injury for which it will have no adequate remedy at law.

The opinion of the Court of Appeals in Brotherhood of Locomotive Engineers et al. v. Baltimore & Ohio Railroad Company et al., supra, came out before the expiration of the time given the parties hereto for filing briefs. The decision in that case appeared to have such an important bearing on the issues in the present suit that it was concluded to await the decision of the Supreme Court on petition for writ of certiorari. The Supreme Court made a final disposition of that case in one proceeding on March 4, 1963, in which it granted certiorari and affirmed the judgment of the Court of Appeals. 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759.

Since there is little disagreement between the parties over the position of the Railroad, as made by its pleadings and briefs on file, it will be stated first. It is that this suit involves merely a grievance or complaint over a matter confined to individuals in a local situation, and that the purpose of it therefore is only to seek an interpretation of the existing collective bargaining agreement in a particular fact situation. The Railroad maintains that for such reasons the dis-

pute is a minor one over which the National Railroad Adjustment Board has exclusive jurisdiction.

On the other hand, the Union insists that its claim is not predicated upon an interpretation of the collective bargaining agreement, and that it makes no attempt to allege a cause of action under such agreement. It contends that the unilateral action of the Railroad in deciding upon, and in taking steps to put into effect, its plan to eliminate the yardmaster classification in the Fort Worth yard alone or on the entire line generally created a major dispute which required the Railroad to give notice to the Union, to negotiate and bargain with it, and to comply with the other conciliatory and mediation procedures provided in the Railway Labor Act for the handling of such disputes. Its position is that the cause of action which it alleged is based upon a violation by the Railroad of the statute rather than of the contract.

The Railway Labor Act classifies the two types of disputes in subdivisions (4) and (5) of Sec. 151a, 45 U.S.C.A., as: "(4) * * * disputes concerning rates of pay, rules, or working conditions; (5) * * * disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." While the Act itself does not make any reference to major disputes and minor disputes in those terms, the courts have consistently typed the first class of disputes above as being major, and the second as being minor. Elgin, J. & E. R. Co. v. Burley, 1945, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886; Slocum v. Delaware, L. & W. R. Co., 1950, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795; Order of Railroad Telegraphers v. Chicago & N. W. R. Co., supra; Brotherhood of Locomotive Engineers v. Baltimore & Ohio R. Co., supra.

Elgin, J. & E. R. Co. v. Burley, supra, discusses the differences between disputes involving negotiations to secure collective bargaining agreements, the formation of them, or an effort to change the terms of them, and disputes over grievances relating to the interpretation or the proper application of the terms of an existing agreement to a specific situation. In that connection, the Court said:

"In general the difference is between what are regarded traditionally as the major and minor disputes of the railway labor world. The former present the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid. Because they more often involve those consequences and because they seek to create rather than to enforce contractual rights, they have been left for settlement entirely to the processes of noncompulsory adjustment.

"The so-called minor disputes, on the other hand, involving grievances, affect the smaller differences which inevitably appear in the carrying out of major agreements and policies or arise incidentally in the course of an employment. They represent specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so. Because of their comparatively minor character and the general improbability of their causing interruption of peaceful relations and of traffic, the 1934 Act sets them apart from the major disputes and provides for very different treatment." (325 U.S. 723–724, 65 S.Ct. 1289–1290, 89 L.Ed. 1894–1895).

The procedure for handling each class of dispute set out in the Railway Labor Act, 45 U.S.C.A. Secs. 152–160, is fully discussed in each of the four cases above cited.

■■ They say that the Act seeks to induce agreement by requiring good faith negotiations as the first step in resolving each type of dispute. 45 U.S. C.A. Sec. 152. After that, the procedure is different for each class. Where the parties fail to accomplish a settlement of a major dispute in the initial negotia-

tions, they must exhaust administrative machinery for mediation, arbitration (if acceptable to both), and adjustment of the controversy. 45 U.S.C.A. Secs. 152, 155–159. Under certain circumstances, the President may appoint an Emergency Board if nothing is accomplished by the use of the other methods provided by the Act. 45 U.S.C.A. Sec. 160. There is, however, no legal compulsion at any stage on the parties to agree. The purpose of the Act is to induce the parties to make a voluntary settlement by providing "[e]very facility for bringing about an agreement" and by applying "pressures for mobilizing public opinion." Elgin, J. & E. R. Co. v. Burley, supra, at p. 725 of 325 U.S., at pp. 1290–1291 of 65 S.Ct., at p. 1895 of 89 L.Ed. If exhaustion of all statutory methods avails nothing, the parties are relegated to self-help in adjusting the dispute. Brotherhood of Locomotive Engineers v. Baltimore & Ohio R. Co., supra.

The so-called Section 6 notice which is required to be given in controversies involving major disputes is provided for in 45 U.S.C.A. Sec. 156:

"Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the

Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

Sec. 156 must be considered in connection with Sec. 152, Seventh, which says:

"Seventh. No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, *as a class*, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title." (Emphasis added.)

If negotiations fail to settle a minor dispute, the second step is submission of the matters to the National Railroad Adjustment Board. Secs. 2 and 3, Railway Labor Act, 45 U.S.C.A. Secs. 152 and 153. " * * * Each party to the dispute may submit it for decision, whether or not the other is willing, provided he has himself discharged the initial duty of negotiation. * * * " Elgin, J. & E. R. Co. v. Burley, supra, at p. 727 of 325 U.S., at pp. 1291–1292 of 65 S.Ct., at p. 1896 of 89 L.Ed.; 45 U.S.C.A. Sec. 153, First (i). From then on, the procedure does not depend upon the will of the parties. The Adjustment Board, after due notice and hearing, has the authority to make an award which is binding on the parties. " * * * Precedents established by it, while not necessarily binding, provide opportunities for a desirable degree of uniformity in the interpretation of agreements throughout the nation's railway systems." Slocum v. Delaware, L. & W. R. Co., supra, p. 243 of 339 U.S., p. 579 of 70 S.Ct., p. 800 of 94 L.Ed.

The many dissenting opinions in the Supreme Court cases show that while the Justices may agree upon the test for determining whether a dispute is major or minor, there is often disagreement even among them over the result of the application of the test.

Many cases have been cited in the several briefs filed by the parties; but the

Court is of the opinion that the question in this case is settled by the decisions in Brotherhood of Locomotive Engineers et al. v. Baltimore & Ohio R. Co. et al., supra, and Order of Railroad Telegraphers v. Chicago & N. W. R. Co., supra. The conclusion from the opinions in those cases is that the controversy between the Union and the Railroad in the present suit is a major dispute.

The plaintiffs in the Baltimore & Ohio R. Co. case were the five separate labor organizations representing respectively the Locomotive Engineers, the Locomotive Firemen and Enginemen, the Railroad Trainmen, the Railway Conductors and Brakemen, and the Switchmen on a nationwide scale. Sixteen railroad companies were sued individually and as representatives of a class of more than two hundred other railroads. The Organizations prayed for a judgment declaring unlawful a "Promulgation of Revision in Work Rules" issued by the defendants, affecting the Carriers' operating employees represented by the Organizations in collective bargaining under the Railway Labor Act. The Carriers claimed that they were issuing the promulgation for the purpose of drawing up "sound new work standards for the railroad industry" to meet the "changes in the light of the great technological improvements in the industry." The opinion of the Court of Appeals, 310 F.2d at page 506, says that the proposed changes contemplated the following:

"1. The elimination of existing rules and agreements requiring the use of firemen on other than steam locomotives when used in yard and freight service.

"2. The revision of rules governing the basis of pay and the assignments of railroad operating employees used in through freight and straightaway passenger service.

"3. The elimination of rules requiring the use of a stipulated number of trainmen in road train crews and a stipulated number of brakemen (helpers) in yard ground crews.

"4. The elimination of rules requiring the use of operating employees on motor cars and self-propelled work machines used in inspection, construction, repair and maintenance work, and

"5. Various miscellaneous and minor other changes which are not material in these proceedings."

The Court of Appeals adopted the following summary by the Carriers of the effect of the promulgation (310 F.2d p. 512):

"* * * The promulgation simply gives the carriers the right to determine the number of trainmen that shall be used in road train crews and of that number how many are to be assistant conductors, ticket collectors, baggagemen and brakemen. All such employees are now represented by the same organizations for purposes of collective bargaining. It likewise gives the carriers the right to use road crews in yard service and yards crews in road service; but the several classes or crafts involved are represented by the same organizations whether they work in road or yard service. It is clear, therefore, that the organizations' real complaint goes to the carriers' assignment of work. The Railway Labor Act does not deal with this subject."

After it appeared that results would not be obtained from the suggestions that the Organizations work out with the Association of American Railroads a method other than that provided by statute looking towards drawing up new work standards, the Carriers served on the Organizations Section 6 notices of their intended changes, which were the same ones as those involved in the subsequent litigation. The procedures of the Railway Labor Act relating to major disputes, with the exception of the appointment by the President of an Emergency Board under Sec. 10, were exhausted without solving the problems. It was then that the Carriers issued

their promulgations that brought about the filing of the injunction suit by the Organizations. The following quotations from the opinion of the Supreme Court show that all of the courts which passed on the case recognized that it involved a major dispute, and that a Section 6 notice was required and proper:

"The District Court found that both parties had exhausted all of the procedures available under the Railway Labor Act, and that they were therefore free to resort to self-help, restricted only by the possibility of the appointment of an Emergency Board by the President under the provisions of § 10 of the Railway Labor Act." 372 U.S. 288–289, 83 S.Ct. 694, 9 L.Ed. 762.

(The Emergency Board is appointed only in connection with major disputes. 45 U.S.C.A. Sec. 160).

"The Court of Appeals concluded, as had the District Court, that the Railway Labor Act procedures had been exhausted, and that *therefore the § 6 notices served by the Carriers were proper.*" (Emphasis supplied). 372 U.S. 289, 83 S.Ct. 694, 9 L.Ed. 762.

"The only question presented, therefore, is whether the record before us sustains the finding of both lower courts that the parties have exhausted the procedures provided by the Railway Labor Act for *major disputes such as that involved here.*" (Emphasis supplied). 372 U.S. 290, 83 S.Ct. 695, 9 L.Ed. 763.

The case of Order of Railroad Telegraphers v. Chicago & N. W. R. Co., supra, is also authority for holding that the controversy here is a major dispute. In that case, the Railroad submitted to several proper state regulatory commissions a plan whereby a number of small stations on its lines would be closed and the communities would thereafter be served by central agencies to be created, rather than by the local station agents then employed at such stations. The fundamental problem in that case, too, involved modernization of an antiquated system of work standards. Traffic and rural conditions existing when the Railroad was organized in the middle of the 19th century required establishment of railroad stations on an average of seven to ten miles apart, with an agent in each one. The many changes in railroad equipment and in transportation methods had caused the business at the one-man stations to dwindle to the point where the agents were working an average of less than one hour in a normal eight-hour day. The Public Utility Commission of South Dakota found in its hearing on the plan that the workload of the agents in some of the small stations in that State was only twelve minutes a day. The Railroad proposed to abolish many of those small stations, and to set up central agencies to do their work on such number of area bases as would be economically justified. "The plan would necessarily result in loss of jobs for some of the station agents and telegraphers, members of the petitioner union." (362 U.S. at 332, 80 S.Ct. at 762–763, 4 L.Ed. 2d at 778.) After its hearing, the South Dakota Commission entered an order directing that the Railroad make the plan effective immediately as it applied to that State.

While the proposed plan was pending before the regulatory bodies of several states, and before the decision in the South Dakota phase of it, the Union, as the properly certified bargaining agent of the employees affected by the plan, served notice under Section 6 of the Railway Labor Act that it wanted to negotiate with the Railroad for the purpose of seeking amendment of the existing collective bargaining agreement by adding thereto a rule requiring consent of the Union before the Railroad could abolish or discontinue any position of a member of such union in existence on December 3, 1957. The Railroad answered that the law vested the proper state utility commissions with the exclusive power to determine whether station agencies should be discontinued; that the Union had no right to protest

or to seek relief from any source other than the various state commissions on hearings on the plan; and that the Union's request did not raise a bargainable issue under the Railway Labor Act. The Railroad offered to, and did, meet with the Union for the purpose of negotiation and mediation, with the understanding that it was not waiving its position. Nothing was accomplished, and the Union voted to call a strike.

The Railroad filed suit seeking to enjoin the impending strike on the basis that it was illegal, because the Union's contract demand was not a lawfully bargainable subject under the Act. The Carrier asserted that it had the right to abolish the positions without the consent of the Union, under the authority of any proper order of a state utility commission. The Union contended that Sec. 8 of the Norris-LaGuardia Act, 29 U.S.C.A. Sec. 108, deprived the Court of authority to grant injunctive relief because the case involved a labor dispute which the Railroad had refused to recognize and negotiate in good faith as a legally bargainable issue under the Railway Labor Act. On final hearing, the District Court concluded that the Union's demand did relate to "rates of pay, rules and working conditions", and was therefore a bargainable issue under the Railway Labor Act. It held that the strike called to enforce acceptance of the demand was therefore not unlawful, and refused to grant the permanent injunction. The Court of Appeals disagreed with the holding of the District Court, and reversed and remanded with directions to enter the injunction enjoining the strike. Chicago & N. W. R. Co. v. Order of Railroad Telegraphers, 7 Cir., 1959, 264 F.2d 254. The Supreme Court reversed the judgment of the Court of Appeals on the ground that the controversy did present a major dispute which was legally bargainable under the Railway Labor Act, and that the strike was therefore not unlawful and subject to

being enjoined. In so holding, the Supreme Court said:

" * * * The change desired just as plainly referred to 'conditions of employment' of the railroad's employees who were represented by the union. The employment of many of these station agents inescapably hangs on the number of railroad stations that will be either completely abandoned or consolidated with other stations. And, in the collective bargaining world today, there is nothing strange about agreements that affect the permanency of employment. * * * " 362 U.S. at 336, 80 S.Ct. at 764–765, 4 L.Ed.2d at 780.

" * * * In an effort to prevent a disruption and stoppage of interstate commerce, the trend of legislation affecting railroads and railroad employees has been to broaden, not narrow, the scope of subjects about which workers and railroads may or must negotiate and bargain collectively. * * * " 362 U.S. at 338, 80 S.Ct. at 765–766, 4 L.Ed.2d at 781.

"Only a word need be said about the railroad's contention that the dispute here with the union was a minor one relating to an interpretation of its contract and therefore one that the Railway Labor Act requires to be heard by the National Railroad Adjustment Board. We have held that a strike over a 'minor dispute' may be enjoined in order to enforce compliance with the Railway Labor Act's requirement that minor disputes be heard by the Adjustment Board. Brotherhood of Railroad Trainmen v. Chicago River & I. R. Co., 353 U.S. 30 [77 S.Ct. 635, 1 L.Ed.2d 622]. But it is impossible to classify as a minor dispute this dispute relating to a major change, affecting jobs, in an existing collective bargaining agreement, rather than to mere infractions or interpretations of the provisions of

that agreement. Particularly since the collective bargaining agreement which the union sought to change was a result of mediation under the Railway Labor Act, this is the type of major dispute that is not governed by the Adjustment Board." 362 U.S. at 341, 80 S.Ct. at 767, 4 L.Ed.2d at 783.

It is true that a Section 6 notice was served in each of the last two cases cited above. In one of them, it was the union that served the notice, and in the other it was the railroad. However, in each action, the party on whom the notice was served contested the question of whether there was in fact a major dispute involving a bargainable issue justifying a Section 6 notice; and it lost the contest.

The many other cases cited by the parties hereto have been read and studied. A discussion of each of them would only lengthen this opinion without adding value to it. The cases herein above cited and considered in detail are the most recent of those in point decided by the court of last resort. The authorities cited by the Railroad in its briefs are distinguishable upon one or more of the following grounds:

1. They involved specific maladjustments of a detailed or an individual nature.

2. They were concerned only with abolition of individual positions rather than of a bargaining unit classification.

3. The conduct complained of was not calculated to terminate the collective bargaining agreement by destroying the subject matter of it.

In the present case, the Railroad's admitted plan is to get rid of the yardmaster classification in its terminal at Fort Worth, the city where its home office is located. It concedes that such contemplated action is not based upon lack of need for performance of the duties of yardmaster as they now exist or upon any decrease in volume of traffic, present or anticipated. Such of the duties of yardmaster as have been left, after the advent of automation some time ago, will be parcelled out among the Railroad's employees in Fort Worth outside the bargaining unit represented by the plaintiff union. In other words, if the plan is carried out, the work heretofore done by the yardmasters and the volume of traffic will still be there, but the yardmasters will not. That unquestionably amounts to abolishing the classification of yardmaster, not merely to discharging individual employees. The bargaining agreement certainly contemplated that the work theretofore performed by yardmasters would continue to be done by them as long as it existed. That was the very basis of the agreement. The plan is one to make a change in the working conditions of the yardmasters, as a class, and is in the teeth of Sec. 2, Seventh, of the Railway Labor Act prohibiting a railroad from taking action to change the working conditions of its employees, as a class, as contemplated by the agreement, without giving a Section 6 notice and proceeding thereafter on the basis provided for handling major disputes. 45 U.S.C.A. Sec. 152, Seventh.

While it is logical to conclude from the evidence in this case that the plan to get rid of the yardmaster classification applied to the entire Frisco system, the holding in this case could be based alone on the contemplated action in the Fort Worth yards. A bargainable issue can exist when an intended action affects only a part of a railroad's employees in a bargaining unit. It was only the agents in the one-man stations who were affected in the Telegraphers case, supra; but it was there held that the intended change required a Section 6 notice and negotiation. The Union in the present case was not required to sit idly by and wait for its yardmaster classification to be eliminated in one swoop over the entire Frisco system or over just the lines of the Texas subsidiary, when it could see that its classification was being effectively nibbled away in a series of actions in separate terminals.

■ The Railroad contends that the Union should not be permitted now to insist that the controversy involved is a major dispute, because some of the former complaints regarding the abolition of yardmasters' positions were submitted to the National Adjustment Board. The awards of the Adjustment Board do no more than settle the particular incident being decided. They do not even have any binding effect on the Board itself as precedents. Slocum v. Delaware, L. & W. R. Co., 339 U.S. at p. 243, 70 S.Ct. at 579, 94 L.Ed. at p. 800. The Union had the right to seek full redress under the Railway Labor Act when it awoke to the real result that would inevitably follow from the total of a series of acts which could have appeared at first to be local in nature. When the Railroad sought to do away with the yardmaster classification in the terminal located in the center it had selected for its operations in Texas, it was time for the Union to realize that the Railroad was acting on the basis that the position of yardmaster was obsolete. The deep interest of the public in matters calculated to affect the uninterrupted operation of its interstate transportation system requires that this problem be faced for what it really is now, regardless of any prior actions before the Adjustment Board involving specific incidents.

The Railroad insists that the dispute involves only a grievance infraction under the agreement that should be handled as a local matter under Rules 11 and 12 thereof, or a question of interpretation of such existing agreement over which the National Railroad Adjustment Board has exclusive jurisdiction. It says that the controversy is therefore only a minor dispute. That claim does not fit the scope of the intended action, the effect of its results on the contract, or the possible consequences to the general public. It is an action that will change working conditions as they are contemplated by the agreement. If the plan continues, it will terminate that agreement by destroying the subject matter thereof. It is only reasonable that the Union will use every legal means to keep from losing the contract by planned erosion. That kind of issue does not meet the test of a minor dispute given in any of the cases heretofore cited, nor in the Supreme Court's terse definition of that term in the recent case of Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 1957, 353 U.S. 30, 33, 77 S.Ct. 635, 1 L.Ed.2d 622, 625:

"* * * These are controversies over the meaning of an existing collective bargaining agreement in a particular fact situation, generally involving only one employee. * *"

There is nothing in the grievance procedure set up by the agreement that was intended to or could cope with the problem here. The Adjustment Board does not have the facility or the power to handle it.

■ The answer to the contention that this case involves only an interpretation of the existing agreement is that the Union's cause of action is based upon an alleged violation of its statutory right under the Railway Labor Act to bargain over a major dispute. The Railroad has tried to convert the suit into one calling for an interpretation of the contract by using its answer to inject that question into the case. The Act does not give a defendant, railroad or union, the power to change a major dispute into a minor one merely by claiming in its answer that some provision of the contract is applicable.

■ The Railroad defends on the ground that it is under no duty to maintain yardmasters' positions, and that it has the right to discharge them on 48 hours notice. It bases that defense on the following portions of the collective bargaining agreement:

"Rule 15. Yardmasters will be given 48 consecutive hours advance notice of reduction in force, with copy to General and Local Chairmen."

"Rule 16(e). This agreement shall not be construed as an obliga-

tion to maintain or establish yard-masters' positions, nor as restricting the Company's right to discontinue yardmaster positions now or here-after established."

A consideration of the agreement as a whole, construed in the light of its pur-pose, compels the conclusion that the language quoted does not purport to give the Railroad the power or authority to terminate the contract by eliminating the yardmaster classification entirely, whether done at one time or by a de-liberate unilateral process of attrition. A reasonable construction is that the rules contemplate an ordinary reduction in force due to decrease in volume of traffic or to lack of need for performance of the duties of yardmaster. It is hardly credible that the Union would have agreed to anything permitting the trans-fer of the duties of its classification to employees outside its bargaining unit. The provisions of a formal contract for its own termination usually leave no question about their purpose and the means of bringing about the demise.

Even if the Railroad had the full right it claims under the contract, the Union would not be deprived of the right to bargain over the intended action to change working conditions. In the Rail-road Telegraphers case, supra, it was conceded that under the bargaining agreement there existing, the carrier had the legal right to release its station agents. That was the right about which the union wanted to bargain. However, the carrier in that case had an even stronger position than a claim of contract right. The Public Utility Commission of South Dakota had ordered it to take action that would necessarily result in the dismissal of a number of the agents. The legality of the Commission's order does not appear to have been questioned; but the Supreme Court held that the carrier had to bargain with the union over its plan to create the central agen-cies. The Railway Labor Act does not limit the scope of its provisions regard-ing bargainable issues to those cases where the purpose of the intended plan is prohibited.

The truth, taken from the evidence in this case and from those general matters of common knowledge relating to the con-dition, equipment and operation of the railroads, is that the fundamental prob-lem of obsolescence of work standards over which the Railroad and the Union are arguing in this case is closely kin to those confronting the five on-train unions and the more than two hundred carriers in Brotherhood of Locomotive Engineers, et al. v. Baltimore & Ohio R. Co., et al., supra. The quotations that follow from documents of the respective parties, as they are quoted in the opinion of the Court of Appeals in that case, show that about the only important thing the rail-roads and the unions there have agreed upon is that the solution of the problem calls for the best help that can be provid-ed. The letter from the head of the Association of American Railroads to the President of the United States said:

"Finally, and perhaps most im-portant, drawing up sound new work standards for the railroad industry has become so complex and challeng-ing that the machinery provided for settling ordinary disputes appears hopelessly inadequate to cope with this task. Only a new, broader-based and determined approach has real hope of coming up with work-able and fair solutions." 310 F.2d at 506.

The unions later asserted in the course of the negotiations "that the work rules problem is 'too difficult' to be resolved under the regular procedures of the Rail-way Labor Act." 310 F.2d at 508.

It is now showdown time for manage-ment and labor in the railroad industry.

Their standards must be modernized and reconciled with technological progress. As far as is possible, the opportunity should be afforded all the railroads and all the unions to consider the general problems on the same plane. A strike by any one union alone could seriously impair, if not completely paralyze, the whole interstate transportation system. The contest over obsolescence shown by the evidence to exist between the Railroad and the Union in this case calls for a major overhaul job. It should not be cheapened by treating it as one which can be cured by patchwork or a minor tune up. The solution of the problem presented in this case will require the use of "[e]very facility for bringing about an agreement" and the application of the "pressures for mobilizing public opinion", mentioned in Elgin, J. & E. R. Co. v. Burley, supra (325 U.S. at p. 725, 65 S.Ct. at pp. 1290–1291, 89 L.Ed. at p. 1895), as being provided for working out major disputes. Nothing can be accomplished by holding that the Railroad should continue to act unilaterally. Security and stability of jobs in an entire bargaining unit classification are at stake.

The parties hereto will be directed to take the course under the Railway Labor Act which will require them to meet and negotiate under the procedures provided for settling major disputes, where both sides of the question will be presented and the public will have some assurance that any adjustment found to be necessary will be cushioned by tempering business efficiency with humaneness.

This opinion will serve as findings of fact and conclusions of law under Rule 52(a), Federal Rules of Civil Procedure.

Judgment will be entered for the plaintiff as prayed for, in the light of the findings and conclusions expressed herein.