## RAILROAD YARDMASTERS OF AMERICA, AFL–CIO, Plaintiff,

### v.

## ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, Defendant.

### Civ. A. No. 3–634.

United States District Court
N. D. Texas,
Dallas Division.

Aug. 5, 1964.

Mullinax, Wells, Morris & Mauzy, Charles J. Morris, Dallas, Tex., for plaintiff.

Burford, Ryburn & Ford, by Sam P. Buford and Robt. E. Burns, Dallas, Tex. (Allen, Gambill & Gambill, Ft. Worth, Tex., Ernest D. Grinnell, Jr., Paul R. Moody, St. Louis, Mo., of counsel), for defendant.

HUGHES, District Judge.

### FINDINGS OF FACT.

1. Plaintiff is Railroad Yardmasters of America, AFL–CIO, hereinafter called Union. Defendant is St. Louis-San Francisco Railway Company, hereinafter called Railroad.

2. Yardmasters is an unincorporated association organized for the purposes of a labor organization and is certified by the National Mediation Board pursuant to the Railway Labor Act, 44 Stat. L. 555; 45 U.S.C. §§ 151–163, as the

representative of the craft or class of yardmasters employed by Railroad.

3. Railroad is a Missouri Corporation operating an interstate railroad, including railroad yards located in the Cities of Fort Worth, Texas, Enid, Oklahoma, and elsewhere. Among the classification of employees employed by Railroad is "yardmaster."

4. There is presently in effect between the Union and the Railroad a collective bargaining agreement concerning rates of pay, rules and working conditions of yardmasters.

The "Scope" of the agreement is contained in Rule 1, which provides that the agreement governs "the hours of service, working conditions and rates of pay of Yardmasters." Although such Scope Rule does not define the work of yardmasters as such, it states that "Yardmaster" means "Yardmasters of all grades except as otherwise provided herein; " "general yardmasters" at eight named terminals are specifically excepted from the Agreement. Fort Worth is not excepted, however, and the position of general yardmaster at Fort Worth was brought under the basic agreement by a letter agreement of the parties which is attached to the collective bargaining contract. The only exceptions in the Scope Clause relating to the performance of yardmaster work by non-yardmasters are the provisions in Rule 1(b) and 1(c) reading as follows:

"(b) * * * It is understood and agreed there shall be no restrictions upon the company as to yardmaster or other duties which may be required of or performed by general yardmasters filling positions listed in this rule.

"(c) This agreement does not change present practice of officers of the railway, agent yardmasters or footboard yardmasters directing or supervising switching of yard service."

None of the provisions in the contract expressly authorizes the abolishment of the classification of yardmaster.

Rules 15, 16(b) and 16(e) of the contract, pertaining to reduction in force, classification of positions, and discontinuance of positions read as follows:

"Rule 15. Yardmasters will be given 48 consecutive hours advance notice of reduction in force, with copy to General and Local Chairmen."

\* \* \* \* \* \*

"Rule 16(b) It is agreed classification of positions covered by this agreement, according to work assignment in effect on date of this agreement, is correct."

\* \* \* \* \* \*

"Rule 16(e) This agreement shall not be construed as an obligation to maintain or establish yardmasters' positions, nor as restricting the Company's right to discontinue yardmaster positions now or hereafter established."

A prior award of the National Railroad Adjustment Board, Fourth Division, Award No. 797, Docket No. 813, dated June 30, 1952, construed the Scope Rule of this same contract as follows:

"The Scope Rule does not purport to define the work of Yardmasters. By custom and usage it is well understood, however, that the principal duties of Yardmaster are to supervise the employees engaged in making up, breaking up and handling of trains and switching in railroad yards. By reason of the Agreement with the Yardmasters, such work belongs exclusively to that craft or class and, subject to definite exclusions mentioned in the Agreement, may not arbitrarily be removed from Yardmasters and performed by persons of a different class or craft not covered by the Agreement."

5. The Railroad's current Rules of the Transportation Department describe the duties and responsibilities of various employee classifications of the Railroad, including the nature of the work regu-

larly performed by yardmasters (Rules 825 through 829) as follows:

## "YARDMASTERS

"825.  Yardmasters will report to the general yardmaster, trainmaster, assistant superintendent or superintendent.  They have charge of the yards assigned to them and have supervision of all yard employes and other train and engine men when within yard limits.  They will require the proper discharge of duty and observance of rules by all employes subject to their direction.

"826.  They are responsible for making up and dispatchment of passenger trains on schedule.  Where switching is performed on passenger trains, they will arrange for engine to be available and for the work to be done promptly.

"827.  They are responsible for the making up of freight trains with proper tonnage and will arrange to have train properly classified, checked and inspected before leaving time.  They will see that conductor is provided with waybills for loaded cars and billing and home route cards for empty cards.  They will see that freight assigned to particular trains is forwarded in such trains.

"828.  They are responsible for compliance with requirements as to diversions, refrigeration, ventilation and heating of cars of perishable freight, the safe and proper handling of explosives and flammables and the prompt handling of livestock to prevent over-confinement.

"829.  They must, unless otherwise provided:

"See that notices are posted on bulletin boards, and that all obsolete notices are removed.

"Arrange for proper inspection of cars; and that cars requiring repairs or transfer are promptly placed and moved after repairs or transfers are completed.

"Require daily check of waybill racks and see that all cars are moved promptly.

"Make prompt wire report of all accidents and personal injuries.

"See that engine and train men are ready to leave at the appointed time."

6.  On October 8, 1962 Railroad issued notices to all of the yardmasters employed in the Fort Worth, Texas yards (a general yardmaster, two yardmasters, and a relief yardmaster) that all of the yardmaster positions in Fort Worth were being abolished.  Whereupon, Union filed a suit against Railroad in the U. S. District Court, Fort Worth Division, Northern District of Texas, praying that Railroad be enjoined from abolishing the classification of yardmaster at its Fort Worth yards.  The injunction was granted.

The United States District Court in its decision held the dispute to be a major dispute and directed the parties to proceed under Section 6 of the Railway Labor Act.  Railroad Yardmasters of America v. St. Louis, San Francisco & Texas Railway Company, 218 F.Supp. 193.

The United States Court of Appeals for the Fifth Circuit reversed and remanded the case, holding that this dispute "could be resolved only by construing the existing contract," that the Union "should have been remanded to the grievance procedures set forth in the contract."  328 F.2d 749.

Writ of Certiorari was denied by the U. S. Supreme Court, 84 S.Ct. 1886.

7.  After denial of certiorari, the District Court dismissed the original suit filed by Union for lack of jurisdiction, and the Union on June 19, 1964, filed a claim under the contract with the Superintendent of Railroad in Fort Worth, which claim is the subject of this proceeding.  The claim charged that the Railroad was abolishing the craft or class of yardmasters at Fort Worth, Texas, and transferring yardmaster duties to other employees outside the

yardmaster bargaining unit. It claimed that such action constitutes a change in the currently effective rules and working conditions embodied in the collective bargaining agreement, and that it is therefore subject to the notice, bargaining and status quo provisions of Section 2, Seventh and Section 6 of the Railway Labor Act. Union also claimed, without waiving its first position, that in the alternative Railroad's action in abolishing yardmaster jobs and transferring yardmaster duties to other classifications violates the collective bargaining agreement.

On July 1, 1964, B. C. Davidson, Railroad's Superintendent, denied the claim. On July 13, the Union appealed the denial to Railroad's Director of Labor Relations and also filed suit herein for a preliminary injunction to require the Railroad to maintain the status quo pending final determination of the claim through the grievance procedure of the contract and the National Railroad Adjustment Board.

8. Between July, 1963 and February, 1964, Railroad eliminated all the yardmaster positions (three positions) at Enid, Oklahoma, although it reinstated three yardmaster positions at that location for approximately three months during the 1964 wheat harvest, which positions were terminated in July 1964. There are no yardmasters employed at Enid at the present time. On July 13, 1964, Railroad issued new notices to all of the yardmasters at its Fort Worth yards advising them that all yardmaster positions at Fort Worth would be abolished effective Friday, July 17, 1964. Before such notices were effective, Union filed an Amended Complaint seeking a temporary restraining order as well as a preliminary injunction to require restoration of the Enid positions and enjoining Railroad from abolishing the yardmaster classification at Fort Worth or elsewhere on its lines. This Court granted a temporary restraining order maintaining the status quo as to the Fort Worth positions, but did not order restoration of the Enid positions.

9. Railroad acknowledges that Union's claim is presently pending on the "property," i. e., under the grievance procedure in the contract. Union has offered to waive preliminary steps in the processing of the claim in order to expedite submission of the matter to the Adjustment Board. The Railroad has declined the offer.

10. It is proposed by Railroad to transfer the duties of the yardmaster classification to other of its employees outside the bargaining unit represented by Union; however, there is no diminution of the work requiring performance of yardmaster duties.

11. It is the Railroad's stated position that it has the unilateral right, without violating the collective bargaining contract, to transfer yardmaster duties to other employees, absorb them in the duties of other employees outside the yardmaster classification, and thereby eliminate the yardmaster positions. It is also its stated position that it can abolish specific yardmaster positions to the point where yardmaster employment is reduced to zero. It has already done this at its yards at Enid, Oklahoma, has sought to do this at its yards at Fort Worth, Texas, and admits that it is contemplating doing this at its yards at Sherman, Texas. At Enid, all of the duties which the yardmasters were previously performing are still being performed but they are being performed by other employees outside the yardmaster bargaining unit.

12. The Court finds that it is reasonably probable that Railroad intends to eliminate the classification of yardmaster by unilaterally eliminating yardmaster positions and transferring yardmaster duties to other employees in other classifications. This has been scheduled to occur at the Fort Worth yards, and is actively contemplated for the Sherman yards. The duties of the yardmaster classification throughout Railroad's entire system are substantially the same, and no facts have been presented to show any circumstances which would differen-

tiate the yardmaster situation throughout the system from the situation at the Fort Worth yards.

13. The dispute out of which this controversy arises involves the existence of the classification of yardmaster, the possible discharge of employees from positions long held, job assignments, and rates of pay.

14. If the classification of yardmaster is abolished, most of the displaced yardmasters will exercise seniority in other lower paying classifications and bargaining units, displacing such employees who in turn may displace still other employees with lesser seniority. Some yardmasters hold no seniority elsewhere and will lose their Railroad employment entirely. Work and wage opportunities will be diminished for other employees in classifications into which the yardmasters exercise their seniority.

15. If the yardmaster duties are transferred to other employees, Union's collective bargaining power will most likely be substantially diminished.

16. By the time Union's claim is finally determined through the National Railroad Adjustment Board, if favorable to the union, it might well be impossible to make whole in any realistic sense the union and the employees affected by the abolishment of yardmaster positions.

## CONCLUSIONS OF LAW

1. The National Railway Adjustment Board, not this Court, has primary administrative jurisdiction to pass upon Union's claim and that agency may decide: (1) that it has no jurisdiction because the Railroad's action in eliminating the Yardmaster classification is a change in the rates of pay, rules and working conditions of the class of yardmasters as embodied in the collective bargaining agreement, hence a "major dispute" requiring exhaustion of procedures under Section 6 of the Railway Labor Act before the status quo can be changed by unilateral action of the Railroad; (2) that it has jurisdiction but action eliminating yardmaster positions and transferring duties to employees in

other classifications violates the collective bargaining agreement; or (3) that the action is permissible under the agreement and not in violation thereof.

2. This Court makes no determination as to the merits of the dispute, but holds, upon its examination of the nature of the dispute, that it is reasonably probable that the Railroad's unilateral action in abolishing the yardmaster classification violates the collective bargaining agreement or the Railway Labor Act or both, and that such violation, if carried out, would sacrifice or obliterate a right which Congress created to protect the interest of individuals or the public.

3. Unless the Railroad's action is restrained by injunction, the right in controversy may be materially affected or endangered; therefore, a preliminary injunction is necessary to preserve the subject of the controversy in its existing condition.

4. There being a possibility of long delay in a decision by the National Railroad Adjustment Board, if decision is favorable to Union, reinstatement and back pay or any other remedy ordered by the Adjustment Board would not be an adequate remedy at law under the circumstances then probably existing.

5. The proposed action of Railroad to eliminate all of the yardmaster positions at Fort Worth, Texas, will result in irreparable injury to Union and the yardmasters represented by Union.

6. If the Railroad unilaterally abolishes the yardmaster classification elsewhere on its lines, which is reasonably probable unless prevented by injunction, further irreparable injury to Union and the yardmasters represented by Union will result.

7. There being no provision for the Adjustment Board to maintain the status quo, a court of equity should intervene to protect the interest of individuals whose rights under the Railway Labor Act are probably being violated.

8. There being a substantial possibility that the National Railroad Adjustment Board will hold the action of

Railroad in abolishing all the positions of yardmaster at Fort Worth either violates the existing bargaining agreement or proposes a change in the existing agreement affecting rates of pay, rules or working conditions, and since irreparable injury will result to Union and the yardmasters represented by Union if Railroad's action is to become effective, Union is entitled to an injunction to maintain the status quo pending action by the Adjustment Board.

9. Unless Railroad is enjoined from abolishing the classification of yardmaster, pending final determination of the dispute through the National Railway Adjustment Board,

(a) Substantial and irreparable injury will result to union and the yardmasters it represents;

(b) Greater injury will be inflicted upon the Union and the yardmasters than will be inflicted upon Railroad by the granting of relief;

(c) Union has no adequate remedy at law;

(d) There are no procedures other than injunctive relief which can adequately protect Union and the yardmasters pending final determination of the dispute through the Adjustment Board.

10. Union has complied with all of its obligations imposed by law that are involved in the instant dispute, and has made reasonable effort to settle the dispute in accordance with the procedures of the Railway Labor Act, including offering to submit the dispute directly to the Adjustment Board.

11. Railroad is enjoined from abolishing the yardmaster positions at its Fort Worth yard pending final determination of the dispute by and through the grievance procedure of the collective bargaining contract and the National Railroad Adjustment Board. This injunction is conditioned upon the posting of an injunction bond in the amount of $10,000.00.

12. Yardmasters at Enid having been previously eliminated except during the wheat harvest, maintenance of the status quo does not require Railroad to reinstate such yardmasters at Enid, prior to final determination of the pending dispute through the Adjustment Board, and Union is not entitled to an injunction requiring their reinstatement pending a decision by the Adjustment Board.

13. Railroad's motion to dismiss is overruled.

14. This Court has jurisdiction to grant an injunction maintaining the status quo pending final determination of the matter by and through the National Railroad Adjustment Board.